**ALLIED MECHANICAL AND ELECTRICAL, INC., and State College Electrical and Mechanicals, Inc., Petitioners**

v.

**PENNSYLVANIA PREVAILING WAGE APPEALS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 9, 2007.

Decided May 8, 2007.

---

Thomas R. Davies, Lancaster, for petitioners.

Peter Von Getzie, Asst. Counsel, Harrisburg, for intervenors, Bureau of Labor Law Compliance.

BEFORE: COLINS, Judge, and McGINLEY, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

Allied Mechanical and Electrical, Inc. and State College Electrical and Mechanicals, Inc. (hereafter collectively referred to as Allied)[1] petition for review of the decision and order of the Pennsylvania Prevailing Wage Appeals Board (Board), affirming the adjudication and order of the Secretary of the Department of Labor and Industry. In his order, the Secretary concluded that Allied had intentionally violated the Pennsylvania Prevailing Wage Act (Act)[2] by failing to pay the prevailing wages due its workers on certain public

works projects and debarred Allied from contracting for any further projects for a period of three years.

For the period from July, 2003 through October, 2004, Allied was a contractor or subcontractor on five different public works projects.[3] Following requests from the awarding agencies, the Department of Labor and Industry's Bureau of Labor Law Compliance (the Bureau) issued prevailing wage rate predeterminations for each of the projects. These predeterminations were included by reference in the specifications for each project and were not challenged under Section 8 of the Act, 43 P.S. § 165-8. The Bureau commenced an investigation of Allied in 2003 following a routine site visit by Todd Burns, an investigator with the Bureau. By letter to Allied dated June 25, 2003, Mr. Burns requested copies of payroll records and timesheets and further requested that Allied conduct a self-audit. Allied subsequently provided the requested records. Shortly thereafter, Mr. Burns left his employment with the Bureau and the file was reassigned to Randy Liddle, another investigator for the Bureau.

Upon his review of the file, Mr. Liddle noted several inconsistencies in the records provided by Allied, including hours blackened out on timesheets and altered pay rate codes, i.e., some of the classifications reported by the workers were altered from the higher-paying electrician classification to the lower-paying laborers' classification.[4] By letter dated August 28, 2003,

1. State College Electrical and Mechanicals, Inc. actually owns Allied Mechanical and Electrical, Inc.

2. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165-1–165-17.

3. These projects included work at Fairmount High School (July 2003 through June 2004) and North High School (August 2003 through May 2004) in the State College Area School District; Pollock Hall (April 2003 through

February 2004) and Simmons Hall (March 2003 through August 2003) at the Pennsylvania State University; and West Branch Area High School (February 2004 through October 2004) in the West Branch Area School District.

4. Workers on a public works project are paid according to the classification of the work which they perform. The prevailing wage regulations define "classification" as "[s]pecific categories of jobs which are performed

Mr. Liddle notified Allied that there were "issues relating to the reporting of time worked and classification of some workers" which required additional explanation. (R.R. at 541a). Mr. Liddle further advised Allied that he was scheduling an administrative conference at the Bureau's Altoona office on September 9, 2003, to discuss these issues. Mr. Liddle and his supervisor, Dan Gioiosa, attended the conference on behalf of the Bureau. Scott Good, Allied's Vice President, and Eric Horvat, Allied's operations manager, attended the conference on behalf of Allied. Mr. Good reviewed the altered timesheets and expressed his concern. Mr. Good and Mr. Horvat were asked to conduct a self-audit and to produce a list of activities that they considered to be laborers' tasks, after which the parties would schedule another meeting.

The parties met again on October 7, 2003. At this meeting, Mr. Good and Mr. Horvat provided the Bureau's representatives with corrections to the altered timesheets, noting the worker's name, the amount of hours changed back to the electrician classification and the amount of these changes. Mr. Good and Mr. Horvat also provided the Bureau's representatives with a draft list of sixteen separate activities which they believed fit within the definition of laborers' tasks on a prevailing wage project. Further, it appears that there was some discussion at this meeting of Allied's alleged policy of regularly paying its workers two hours per day at the laborers' rate. Mr. Gioiosa noted that such a policy would be unreasonable. Following this meeting, Mr. Liddle and Mr.

Gioiosa decided to expand the investigation to include other projects as well as a random selection of worker timesheets.[5] Mr. Liddle thereafter selected eleven Allied workers at random and requested the necessary time and payroll records.

Subsequent to this meeting, Allied instituted a policy specifically providing that workers were to be paid based on the work that they were performing.[6] Allied also requested that the Bureau provide it with a list of activities by wage classifications or direct it to where such information could be obtained. The Bureau did not respond to this request. Rather, the parties proceeded to meet again in January of 2004. Mr. Horvat described this meeting as "a little bit more contentious," especially with respect to its request for a list of activities by wage classifications. (R.R. at 308a). At one point, Mr. Horvat indicated that Mr. Gioiosa simply stated "you tell me what it is and then we'll see if we agree." *Id.*

By letter dated January 26, 2004, Mr. Horvat again provided Mr. Liddle with a list of activities/tasks which Allied considered to be unskilled, laborer tasks. This letter was forwarded to Mr. Gioiosa for a response. In a response letter dated March 18, 2004, Mr. Gioiosa informed Mr. Horvat that neither the Act nor its regulations provide a specific list of work activities associated with different classifications. Rather, Mr. Gioiosa noted that such activities are determined by "custom and usage in the building and construction industry." (R.R. at 551a). Nevertheless, Mr. Gioiosa noted that of the fourteen

---

within a 'craft' as defined in this section." 34 Pa.Code § 9.102. "Craft" is defined by these regulations as "[s]pecial skills and trades which are recognized as such by custom and usage in the building and construction industry." *Id.*

**5.** At that point in time, the Bureau's investigation had focused exclusively on Allied's public works project at Simmons Hall.

**6.** This new policy required the project foreman to initial off on a worker's timesheet daily to verify that the hours were appropriate for the work that was performed.

tasks included in Mr. Horvat's previous letter, only the task relating to general clean-up work would be recognized under the laborer classification. Hence, Mr. Gioiosa again requested that Allied conduct a self-audit on all prevailing wage projects since January 1, 2003, and provide a summary to the Bureau. At the same time, Mr. Liddle continued his investigation into the other public works projects completed by Allied, which retained counsel in May of 2004. Counsel for Allied forwarded a letter to Mr. Gioiosa dated May 4, 2004, noting the lack of any definition of the activities which fall under the laborers' classification.

Ultimately, on February 11, 2005, the Bureau issued an order to show cause charging Allied with intentionally failing to pay their workers the predetermined prevailing minimum wage rates for the aforementioned public works projects. Allied filed an answer and the case was assigned to a hearing officer.[7] The hearing officer conducted hearings in this matter on July 28 and 29, 2005. At these hearings, the Bureau presented the testimony of four former workers for Allied during the time period in question, James Smith, Jeffrey Wills, Gregory Walls and Edward Mac-Donald. Mr. Smith worked for Allied from February of 2003 through July of 2004. During this time, Mr. Smith worked on the Pollock Commons, Fairmount and North High School projects. Despite denying that he engaged in any activities that he considered laborer activities, such as core drilling, trenching, unloading of trucks, site clean-up, demolition or safety watch, Mr. Smith indicated that his time-sheets reflected a 6:2 ratio daily, i.e., six hours at the skilled/plumbers' rate and two hours at the laborers' rate.

Mr. Smith further indicated that he was told by his supervisors to record his time in that manner. Mr. Smith noted that Mr. Good had advised him and other workers that Allied utilized the 6:2 ratio in order to "keep [Allied] a little bit more competitive, as far as getting prevailing rate jobs." (R.R. at 38a). In January of 2004, Mr. Smith indicated that a supervisor advised him not to continue utilizing the 6:2 ratio, but to "juggle [the] time around" so that in the end he still had thirty skilled/plumbers' hours and ten laborer hours a week. (R.R. at 39a). On cross-examination, Mr. Smith acknowledged that his current employer pays utilizing a 7:1 ratio.

Mr. Wills commenced his employment with Allied in May of 2002.[8] During his interview prior to his hiring, Mr. Wills indicated that Mr. Good or another Allied representative informed him that the company practice was to pay six hours mechanic rate and two hours laborer rate daily on prevailing wage projects in order to "stay competitive against the union companies." (R.R. at 75a). During his employment, Mr. Wills worked on the North High School project for a total of forty-six hours, receiving two hours at the laborers' rate for each day he was there. Mr. Wills admitted to doing limited work which he considered laborers' work on this project. Mr. Wills also worked on the Fairmount High School project for two days, receiving two hours at the laborers' rate for one day and the full plumbers' rate the second

7. As of July 14, 2003, the Secretary had authorized the hearing officer to act as his representative to preside at hearings, adjudicate cases and execute and issue final adjudications on his behalf with respect to enforcement matters under Section 11 of the Act, 43 P.S. § 165–11. However, on August 2, 2005, the Secretary rescinded the delegation as it pertained to final adjudications and requested that the hearing officer merely prepare draft adjudications and orders for his review and approval.

8. The record is unclear as to when Mr. Wills ceased working for Allied.

day, even though he did not do any laborers' work on this project.

Mr. Walls worked for Allied from July of 1999 through September of 2004. During this time, Mr. Walls worked on the Pollock Commons, Fairmount and North High School projects. Mr. Walls conceded to performing several hours of laborers' work Fairmount and North High School projects, but he could not recall what type of work he did at the Pollock Commons project. Nevertheless, Mr. Walls indicated that he kept track of his time "[s]ame as everybody else, six and two . . . six hours mechanical, two hours labor." (R.R. at 112a).

Mr. MacDonald worked for Allied from September of 2003 through October of 2004. During his interview prior to his hiring, Mr. MacDonald indicated that he was informed by Mr. Good that "on a rated job, we would be paid six and two and regular pay on all non-rate jobs . . . six hours mechanical and two hours labor." (R.R. at 177a). During his employment, Mr. MacDonald worked on the Pollock Commons and Fairmount High School projects, although he could not recall what type of work he did on the latter. Mr. MacDonald conceded to performing several hours of laborers' work on the Pollock Commons project. Nonetheless, as to this project, Mr. MacDonald indicated that he filled out his timecard the same every day, six hours mechanical and two hours labor. However, Mr. MacDonald indicated that Allied changed its policy several months before his termination, noting that he was told by the applicable project managers "not to write six and two, to break it up so it still averaged to [sic] 30 and 10." (R.R. at 181a).

The Bureau further presented the testimony of Mr. Liddle. Mr. Liddle described his investigation of Allied, which is discussed above. The Bureau next presented the testimony of A. Robert Risaliti, an administrative law officer for the Bureau for approximately thirty-one years. Mr. Risaliti indicated that the prevailing wage rates established for the subject projects were adopted from collective bargaining agreements and that none of the rates had been appealed. Mr. Risaliti thereafter testified as to custom and usage in the trades, noting that on plumbing or electrical job sites, laborers routinely perform demolition work, unload trucks to stockpiles, dig trenches, drill common holes and perform clean-up work. On cross-examination, Mr. Risaliti acknowledged the lack of general information available to employers to determine if a specific task should be classified at the laborers' rate or the skilled rate.

Finally, the Bureau presented the testimony of representatives of the plumbers, electricians and laborers' unions as expert witnesses. These witnesses included Terry E. Peck, Jeffrey Miller and John Miller, respectively. Mr. Peck testified that plumbers routinely engage in such tasks as transporting material from a stockpile to the installation point, cutting/drilling holes, performing core drilling, installing pipe hangers and performing some clean-up and demolition work. Mr. Peck noted that laborers traditionally dig and backfill trenches and carry waste materials to a dumpster. Mr. Peck disagreed with Mr. Risaliti that drilling a multi-purpose hole would be laborers' work, but noted that such drilling would generally be performed by the general contractor.

Jeffery Miller testified that electricians cut their own holes, perform core drilling, occasionally unload electrical supplies from a truck, occasionally dig trenches and occasionally perform demolition work, whereas laborers normally unload trucks and dig trenches. Mr. Miller disputed that demolition work involving electrical materials could be performed by laborers and that laborers drill multi-purpose holes, noting

that the latter activity was normally performed by the general contractor. John Miller testified that laborers neither move material for electricians or plumbers, nor unload trucks with electrical or plumbing material. Normally, Mr. Miller indicated that a laborer at an electrical or plumbing job site is involved with clean-up or trench work. Occasionally, Mr. Miller indicated that a laborer does demolition and drilling work.

In opposition, Allied presented the testimony of Mr. Good. Mr. Good stated that he was originally hired as the operations manager and was currently Allied's vice president. Mr. Good admitted telling prospective employees that Allied paid at a 6:2 ratio for prevailing wage work, noting that he was unaware that paying at that ratio was inappropriate. Mr. Good noted that immediately prior to the Bureau's investigation of Allied, several employees were disgruntled over the issue of fringe benefits and a reduction in pay. Mr. Good emphatically denied telling employees to lie to the Bureau if questioned. At the October 7, 2003, meeting with Mr. Liddle and Mr. Gioiosa, Mr. Good indicated that he and Mr. Horvat offered to pay all disputed hours at a specific job site at the skilled rate.

Prior to this meeting, on the way to the meeting site, Mr. Good conceded that he and Mr. Horvat put together a list of what they considered to be laborers' tasks. However, Mr. Good noted that neither Mr. Liddle nor Mr. Gioiosa addressed the specific tasks on this list. Instead, Mr. Good indicated that Mr. Gioiosa indicated that he did not see the 6:2 ratio based on this list and that "he could see seven and one...." (R.R. at 278a). Mr. Good also noted that the 7:1 ratio was repeated as being acceptable at the follow-up meeting in January of 2004. Prior to this meeting, Mr. Good noted that Allied changed its policy regarding the 6:2 ratio and required

workers to record the number of hours and the type of job they were actually performing each day, with such hours and work verified by the project foreman. Mr. Good conceded that the laborers' rate was the lowest rate on the predeterminations.

Allied next presented the testimony of Mr. Horvat. Mr. Horvat noted that he was initially hired as a project manager and currently served as commercial operations manager. Mr. Horvat admitted that Allied was using the 6:2 ratio for prevailing wage work at the time he was hired. Similar to Mr. Good, Mr. Horvat indicated that he did not think that such a ratio was inappropriate. Mr. Horvat noted that Mr. Good never informed any Allied employee to lie to Bureau representatives. Mr. Horvat echoed Mr. Good's recollection of the meetings with Mr. Liddle and Mr. Gioiosa, including Allied's multiple requests for a list of laborers' classifications. On cross-examination, Mr. Horvat indicated that Allied never paid the difference identified at the October 7, 2003, meeting.

Allied next presented the testimony of Ray Zettle, Jr., an Allied employee for ten months with twenty years experience in the construction industry. During his employment as a laborer with another employer, Mr. Zettle indicated that he performed such tasks as saw cutting, trenching, patching, offloading trucks and moving materials. Mr. Zettle also worked for other employers that engaged in prevailing wage work, noting that each employer used ratios for completing timesheets relating to such work. However, when he was hired at Allied, he denied being told a specific manner to fill out a timecard and instead indicated that the hours vary according to the work that is being performed. Finally, Allied presented the testimony of Charles Ward, an employee for almost a year with twenty-five years experience in the construction industry. Mr. Ward noted that laborers'

perform such tasks as patching concrete, digging, handling materials and demolition.

Following these hearings, on January 20, 2006, the Secretary issued an adjudication and order concluding that Allied had intentionally failed to pay the prevailing wages due to workers on the projects described above by mis-classifying tasks performed by the workers as laborers' work that should have been classified as electricians' or plumbers' work. The Secretary thereafter declared Allied to be debarred and prohibited from the award of any public works contract for a period of three years. Further, absent any new documentation from Allied, the Secretary imposed penalties and statutory liquidated damages in the amount of $97,025.46. Allied filed an appeal with the Board.

By decision and order dated August 17, 2006, the Board affirmed the adjudication and order of the Secretary. In its decision and order, the Board rejected Allied's arguments that the Secretary's adjudication was not based on substantial evidence, that the Bureau violated its right to due process by not providing clear guidance on the appropriate classification of laborer work, that the Act was unconstitutionally vague and that the Secretary's rescission of the hearing officer's decisional authority was improper. Allied thereafter filed a petition for review with this Court. The Bureau then filed a notice of intervention. The Board did not participate in this appeal.

█ On appeal,[9] Allied argues that the Secretary's adjudication was not supported by substantial evidence. We disagree.

Section 11(h)(1) of the Act provides that the following "shall constitute substantial evidence of intentional failure to pay prevailing wage rates ... (1)[a]ny acts of omission or commission done willfully or with a knowing disregard of the rights of workmen resulting in the payment of less than prevailing wage rates." 43 P.S. § 165–11(h)(1). The Courts have also spoken on this issue. In *Fiore v. Department of Labor and Industry, Prevailing Wage Appeals Board,* 526 Pa. 282, 288, 585 A.2d 994, 998 (1991), our Supreme Court quoted this Court's underlying decision, stating that "[c]orporate officials cannot 'turn their backs' or 'look the other way,' to avoid specific knowledge of failure to pay prevailing wage rates, and then plead that the failure was unintentional ... The very action of being oblivious to the obvious is, in itself, a knowing disregard to the rights of workmen which mandates severe penalties." We have also previously held that false certification to payment of the prevailing wage as well as advising workers to lie to Bureau investigators can constitute evidence of an intentional violation. *See Duffy v. Department of Labor and Industry, Prevailing Wage Division,* 160 Pa. Cmwlth. 140, 634 A.2d 734 (1993); *Fiore* (citing *Dale D. Akins, Inc. v. Department of Labor and Industry,* 16 Pa.Cmwlth. 191, 329 A.2d 869 (1974)).

█ Allied places heavy emphasis on the fact that the evidence relied upon by the Secretary in reaching his decision included the testimony of four of its former, disgruntled workers, which was contradicted by the testimony of its own witnesses.[10]

---

9. Our scope of review of the Board's decision is limited to determining whether constitutional rights were violated, an error of law was committed and whether necessary findings of fact were supported by substantial evidence. *Department of Labor and Industry, Bureau of Labor Law Compliance v. Lawson*

*Demolition and Hauling Co.,* 856 A.2d 860 (Pa.Cmwlth.2004), *petition for allowance of appeal denied,* 583 Pa. 697, 879 A.2d 783 (2005).

10. Nevertheless, both Mr. Good and Mr. Horvat admitted before the hearing officer that

In essence, Allied is disputing the Secretary's credibility determinations. However, the law is well settled that the Secretary is the ultimate finder of fact in these matters and is free to accept or reject the testimony of any witness, even if uncontradicted. *Boss Insulation & Roofing, Inc. v. Department of Labor and Industry,* 722 A.2d 778 (Pa.Cmwlth.1999); *York Excavating Company, Inc. v. Pennsylvania Prevailing Wage Appeals Board,* 663 A.2d 840 (Pa.Cmwlth.1995). Moreover, the presence of conflicting evidence in the record does not mean that substantial evidence is lacking. *DiLucente Corporation v. Pennsylvania Prevailing Wage Appeals Board,* 692 A.2d 295 (Pa.Cmwlth.1997).

The testimony relied upon by the Secretary is thoroughly summarized above and need not be restated herein. Suffice it to say, this testimony constitutes substantial evidence in support of the Secretary's conclusion that Allied had intentionally violated the Act.

Next, Allied argues that its right to due process and a fair hearing were violated as a result of the Secretary's rescission of the hearing officer's decisional authority as well as a shifting of the burden of proof. We disagree with each of these arguments.

■ We begin with the Secretary's rescission of the hearing officer's decisional authority. By letter dated July 14, 2003, the Secretary formally delegated to the hearing officer the authority to preside at hearings, adjudicate cases and execute and issue final adjudications on his behalf. However, in this same letter, the Secretary specifically advised the hearing officer that said authority "will remain in effect until rescinded." (S.R.R. at 1b). Allied has failed to point to any section of the Act or its regulations prohibiting the Secretary from such rescission. Additionally, as the Board indicated in its decision, "[t]he power to delegate inherently carries with it the power to rescind that delegation." (Board Decision at 38, R.R. at 405a). Further, Allied had a full and fair opportunity to appear before the hearing officer and present its case.[11] Thus, we cannot say that the Secretary's rescission of the hearing officer's decisional authority violated Allied's rights to due process and a fair hearing.[12]

■ We now turn to Allied's argument regarding an alleged shifting of the burden of proof. Allied notes that the burden was on the Bureau to establish a violation but alleges that the burden was shifted to it to disprove the existence of a potential violation. However, our review of the record in this case fails to reveal such a shifting of the burden of proof. To the contrary, the burden remained appropriately on the Bureau throughout the pendency of this matter.

■ Finally, Allied argues that the Act was unconstitutionally vague regarding the appropriate classification of laborers' work such that the Secretary violated Allied's

Allied had utilized a set 6:2 ratio with regard to payment for prevailing wage work.

11. Moreover, "the practice of one tribunal assessing credibility and rendering a decision where another tribunal has received the actual testimony is nothing new in the law." *Biagini v. Workmen's Compensation Appeal Board (Merit Contracting Company),* 158 Pa. Cmwlth.648, 632 A.2d 956 (1993), *petition for allowance of appeal denied,* 537 Pa. 667, 644 A.2d 1203 (1994).

12. Allied further alleges in the course of this argument that the Secretary's rescission of the hearing officer's decisional authority suggested a prejudice and bias held against it. However, Allied points to no evidence in support of this suggestion other than alleged statements made by the hearing officer off the record. Hence, we see no merit to this argument from Allied.

right to due process by finding that it had intentionally violated said Act. Once more, we disagree.

Section 3 of the Act provides that "[t]he specifications for every contract for any public work to which any public body is a party, shall contain a provision stating the minimum wage rate that must be paid to the workmen employed in the performance of the contract." 43 P.S. § 165–3. Section 5 of the Act, 43 P.S. § 165–5, prohibits contractors from paying anything less than the prevailing minimum wages with regard to a public works project. Section 6 of the Act, 43 P.S. § 165–6, outlines the duty of a contractor to keep accurate records of the name, craft and actual hourly rate paid to each worker on such a project. Section 11(a) of the Act, 43 P.S. § 165–11(a), provides that if a public body discovers that a contractor has failed to pay the appropriate prevailing wages, the public body is required to notify the Secretary of the same in writing.

Thereafter, pursuant to Section 11(c) of the Act, 43 P.S. § 165–11(c), the Secretary is required to conduct an investigation, including a hearing. In the event that the Secretary concludes that the contractor's actions in failing to pay the prevailing wage rates was intentional, Section 11(e) of the Act, 43 P.S. § 165–11(e), provides that the contractor shall be prohibited from the award of any public works contract for a period of three years. This Section also permits the Attorney General to seek to recover penalties for such intentional violations.

We note that a statute is presumed to be constitutional and a party challenging the constitutionality of a statute has a heavy burden of persuasion. *Shapiro v. State Board of Accountancy,* 856 A.2d 864 (Pa.Cmwlth.2004), *petition for allowance of appeal denied,* 582 Pa. 712, 872 A.2d 174 (2005). With respect to a "void for vagueness" challenge, we noted in *Meade v. Department of Transportation, Bureau of Driver Licensing,* 813 A.2d 937, 941 (Pa.Cmwlth.2002), that to survive such a challenge "the statute must be written in a manner which affords an ordinary person fair notice of what conduct is prohibited and describes the prohibited conduct in a manner that does not encourage arbitrary or discriminatory enforcement." (Citing *Commonwealth v. Mikulan,* 504 Pa. 244, 252, 470 A.2d 1339, 1343 (1983)). In this case, Section 5 of the Act prohibits contractors from paying anything less than the prevailing minimum wages set for a public works project, said wages being based on the classification of work that an individual is performing.

Admittedly, neither the Act nor its regulations provide a specific definition of what tasks constitute laborers' tasks on any given prevailing wage project. Rather, the regulations define "classification" as "[s]pecific categories of jobs which are performed within a 'craft' as defined in this section." 34 Pa.Code § 9.102. "Craft," in turn, is defined by these regulations as "[s]pecial skills and trades which are recognized as such by custom and usage in the building and construction industry." *Id.* In this regard, we have repeatedly upheld this "custom and usage" standard. *See, e.g., Leonard S. Fiore, Inc. v. Department of Labor and Industry, Prevailing Wage Appeals Board,* 129 Pa.Cmwlth. 583, 566 A.2d 632 (1989), *reversed on other grounds,* 526 Pa. 282, 585 A.2d 994 (1991); *Jackard Construction Company, Inc. v. Pennsylvania Prevailing Wage Appeals Board,* 43 Pa.Cmwlth. 565, 403 A.2d 618 (1979); *Department of Labor and Industry v. Altemose Construction Company,* 28 Pa.Cmwlth. 277, 368 A.2d 875 (1977).[13]

---

13. In our decision in *Fiore,* 566 A.2d at 637, we rejected an argument from an experienced public works contractor, identical to the current argument raised by Allied, as "specious."

Moreover, in the present case, Allied's violation of the Act was not the result of the Act's silence with respect to a specific definition of laborers' tasks. Instead, Allied's violation of the Act was premised upon its utilization of a set 6:2 ratio for prevailing wage projects, regardless of the work being performed, its continued use of this ratio even after being advised by Bureau representatives that the same was improper and its advice to employees to juggle their timecards but still end up with this same ratio.

Thus, we cannot say that the Act was unconstitutionally vague regarding the appropriate classification of laborers' work such that the Secretary violated Allied's right to due process by finding that it had intentionally violated said Act.

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this 8th day of May, 2007, the order of the Pennsylvania Prevailing Wage Appeals Board is hereby affirmed.