**John C. FISLER, Petitioner**

v.

**STATE SYSTEM OF HIGHER EDUCATION, CALIFORNIA UNIVERSITY OF PENNSYLVANIA, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2013.
Decided Oct. 17, 2013.

Kenneth A. Sprang, Chevy Chase, MD, for petitioner.

Jeffrey B. Hawkins, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, BROBSON, Judge, and COLINS, Senior Judge.

OPINION BY Judge BROBSON.

John C. Fisler (Fisler) petitions for review of an order of the Chancellor of the State System of Higher Education (SSHE), dated January 3, 2013. The Chancellor adopted a proposed adjudication [1] and order of a hearing officer, thereby denying Fisler's motion for a new hearing and affirming the decision of California University of Pennsylvania (University) to suspend and subsequently discharge Fisler from his employment with the University for poor job performance. In so doing, the Chancellor concluded that the University's decisions were supported by just cause. For the reasons set forth below, we now affirm.

The findings of fact as adopted by the Chancellor are summarized as follows. Fisler began working for the University's Development Office as a major gifts officer on October 8, 2007. (Finding of Fact (F.F.) no. 18.) Subsequently, Fisler was named to the position of Associate Vice President for Development and Campaign

---

1. Aside from striking finding of fact number 11 from the proposed adjudication, the Chancellor adopted the proposed adjudication in its entirety.

Planning. (F.F. no. 33.) In that position, Fisler managed all of the gift officers and reported directly to the president of the University, Angelo Armenti, Jr. (President Armenti), because the intermediary position of Vice President for Development and Alumni Relations was left vacant. (F.F. nos. 33–34.)

Eventually, it became evident that Fisler's management performance was not positive, in that the general sense was that he was not a leader. (F.F. no. 41.) Because the Development Office was not making the progress he expected in terms of raising money and he and Fisler were not doing well as a team, President Armenti sought to fill the position of Vice President for Development and Alumni Relations, which President Armenti had been filling himself. (F.F. nos. 43–45.) Although Fisler applied for this position, President Armenti ultimately hired Ron Huiatt (Huiatt), who started working for the University in November 2009. (F.F. nos. 55, 64.) President Armenti, however, was so impressed with Sharon Navoney (Navoney), another candidate who was already employed at the University as Senior Director of Major and Planned Gifts, that he envisioned a reorganization in which Huiatt was "number one" and Navoney was "number two," which would result in the placement of Fisler elsewhere in the organizational structure of the Development Office. (F.F. nos. 63, 65.)

Upon beginning work at the University, Huiatt and President Armenti discussed how to develop an effective fundraising operation at the University. (F.F. no. 69.) President Armenti indicated to Huiatt that he was generally dissatisfied with the productivity and accountability of the Development Office under Fisler's oversight, and he directed Huiatt to reorganize the Development Office staff without eliminating any employees. (F.F. nos. 70–71.) Af-

ter conducting a review of the Development Office, Huiatt made various changes to the organization of the Development Office, including elevating Navoney to Associate Vice President and giving her the majority of the management responsibilities within the Development Office. (F.F. nos. 73, 77–78, 86.) Huiatt also decided to make Fisler a special advisor to Huiatt, naming Fisler Senior Advisor and Senior Associate Vice President for Special Initiatives. (F.F. nos. 79, 87.)

With the reorganization, Fisler's role in the Development Office changed from overseeing all of the campaign and development activities and staff to providing advice and counsel to Huiatt; serving as primary liaison to the athletic development team; leading various special initiatives at Huiatt's direction; carrying a small, select portfolio of major gift prospects; and representing the Vice President's Office when Huiatt was unable to do so. (F.F. nos. 85, 87.) President Armenti approved the restructuring plan effective January 1, 2010, and Huiatt presented the restructuring plan to his staff in January 2010. (F.F. nos. 80, 84.) Fisler was upset with the changes to his responsibilities and did not find them to be challenging or edifying, because they were consistent with things he had done 25 to 30 years earlier in his career. (F.F. nos. 88, 92.)

In March 2010, Fisler contacted Dr. Lisa McBride, who is the Special Assistant to the President for Equal Employment Education Opportunity at the University. (F.F. nos. 93–94.) Fisler did so because certain members of the search committee for the Vice President for Development and Alumni Relations position communicated that there had been irregularities in the search, and Fisler had his own concerns about age discrimination, retaliation, and being treated unfairly with regard to the most recent reorganization of the De-

velopment Office. (F.F. nos. 94, 96.) Although Dr. McBride initially told Fisler that she had heard some rumors about improprieties in the search, she later told him that that was not the case, and that social equity procedures required Fisler to file a formal complaint. (F.F. nos. 95, 97.) Because Fisler wished to pursue an informal resolution, Fisler and Huiatt engaged in mediation regarding the reorganization and Fisler's role at the University, but the mediation was ultimately unsuccessful.[2] (F.F. nos. 98, 106–14.)

Based on Fisler's general demeanor as to the reorganization and his new role at the University, Huiatt inferred that Fisler was not willing to take on the proposed functions assigned to him as a consequence of the reorganization. (F.F. no. 120.) Because of his concerns regarding Fisler's recalcitrance, Huiatt, with President Armenti's approval, redefined Fisler's job description to provide him with very specific information about what was expected of Fisler in his job responsibilities. (F.F. no. 122.) Huiatt provided Fisler a letter dated April 7, 2010, providing that Fisler's suggestions at the mediation session about his work assignments did not fit the needs of the University's Development Office, and outlining Fisler's new work duties as a lead field officer, a position which Huiatt thought would be best suited for Fisler. (F.F. nos. 121, 123–24.) These duties included cultivating, soliciting, and steward-

ing major and planned gifts; managing a portfolio of 100 prospects who had been pre-screened for a gift capacity of $25,000; serving as liaison to the Athletic Department fundraising staff; managing the faculty and staff capital campaign initiatives; serving as a member of the University Development and Leadership Team; overseeing the activities of a Clerk Typist 3 in the Development office; and assisting the Vice President. (F.F. no. 124.) With regard to the management of the prospect portfolio, the job description indicated that Fisler would be expected to make, on average, 12 visits a month with prospects, 3 of which would be solicitation meetings where the prospect is asked for a gift at the rated capacity level, and 2 or fewer of which would be stewardship meetings, and to replace disqualified prospects with new prospects with a gift capacity of at least $25,000 so as to maintain a portfolio of 100 prospects. (F.F. no. 125.) The letter also provided that, although Fisler might prefer to perform other tasks, the tasks outlined in the job description were those that would best serve the needs of the Development Office and the University. (F.F. no. 128.) The letter also provided that Fisler should perform the assigned work duties in a high quality, effective, and efficient manner, and that failure to perform the assigned tasks could lead to corrective action, up to and including termination of employment.[3] (F.F. nos. 128–29.)

2. Following the mediation, Fisler filed a formal complaint of age discrimination with SSHE and a complaint with the Pennsylvania Human Relations Commission (PHRC), both of which were based on the information he had been given regarding possible improprieties in the search for a Vice President for Development and Alumni Relations and on the removal of his management responsibilities. (F.F. no. 119.) The complaint filed before the PHRC was still pending at the time of the hearing in this matter, and the SSHE investigation found no merit to the complaint. (*Id.*)

3. The Chancellor found that it is management's right and prerogative to direct the work force, including assigning duties to personnel, and that it is reasonable that the University would expect its employees to meet those duties set forth in a job description or articulated during weekly meetings. (F.F. no. 209.)

Although Fisler was assigned an initial list of prospects, he had unfettered access to the pool of prospective donors, such that he could seek out other prospects at will, as all major gifts officers at the University were expected to do. (F.F. nos. 138–39.) Although Fisler had complaints regarding what he believed were the limitations of his portfolio, Huiatt expected Fisler to access the pool, which was the same pool of 4,000–plus prospects used by all other prospect managers in the Development Office, for additional prospects after disqualifying prospects in his portfolio. (F.F. nos. 140–41.) Moreover, Fisler was not prohibited from obtaining prospects from other lists available to him or from other gift-capacity categories. (F.F. no. 145.)

Huiatt and Fisler met weekly to discuss Fisler's job performance and, eventually, the need to improve it. (F.F. no. 152.) During a weekly meeting on December 10, 2010, Huiatt and Fisler went over Fisler's job performance over the preceding 8 months, with Huiatt noting that Fisler was not meeting expectations. (F.F. no. 159.) Specifically, as of November 24, 2010, Fisler's portfolio contained approximately 61 prospects, and as of the December meeting, Fisler was averaging only 4 visits with prospective donors a month. (F.F. nos. 158–59.) Huiatt encouraged Fisler to improve his performance and to not be constrained by the initial prospect list or territory if other prospects were available. (F.F. no. 160.) Huiatt told Fisler that Fisler should be achieving 8 to 12 visits a month with prospects and that a significant number of those visits should be solicitations, and that as Senior Vice President and an experienced major gifts officer, Fisler should be a leader in the area of prospect visits. (F.F. no. 161.) Huiatt also told Fisler that Fisler's job performance would be reviewed again in January 2011 and that Fisler's number of prospect visits

would be expected to increase significantly. (F.F. no. 163.)

During a weekly meeting on January 28, 2011, Huiatt explained to Fisler that Fisler did not receive a merit increase because of his continuing poor job performance. (F.F. no. 166.) Although Fisler responded that he was doing an adequate job and performing as well as others in the Development Office, Huiatt reiterated that he expected Fisler to be a leader in the Development Office because of his senior-level position, title, and experience. (F.F. no. 167.) Huiatt also reminded Fisler of the goals that he had provided Fisler in April 2010 and advised Fisler that Huiatt would closely monitor Fisler's performance over the next quarter to determine whether he should retain Fisler on the Development Office staff. (F.F. no. 168.)

After a meeting on April 25, 2011, Huiatt issued a letter to Fisler conveying the severity of his concern about Fisler's job performance by pointing out that Fisler's numbers were still low with regard to the number of prospect visits Fisler was making and the number and value of the proposals he had closed since April 2010. (F.F. no. 169.) Huiatt recognized in the letter that Fisler was not performing the function he wanted to at the University, and during the meeting Huiatt told Fisler that Fisler's continued poor performance left Huiatt no room to retain him on the Development Office staff, especially given Fisler's senior level position, compensation, and experience. (F.F. no. 170.) Fisler responded that he was not being productive because the prospect pool had been "picked over." (F.F. no. 171.) Huiatt and Fisler met again on May 9, 2011, when they discussed the prospects Fisler had disqualified from his portfolio but failed to replace, thus allowing his prospect portfolio to drop well below the initial standards set by Huiatt in April

2010.[4] (F.F. no. 174.)

During a meeting in early May 2011, Huiatt recommended to President Armenti that Fisler be terminated for poor performance, memorializing the recommendation in a memorandum to President Armenti dated May 9, 2011. (F.F. no. 176.) In the memorandum, Huiatt explained that Fisler had maintained a portfolio of around 70 prospects, even though Huiatt had repeatedly requested that Fisler increase the size of his portfolio, and that since July 2010, Fisler had averaged only 6 prospect visits a month; made 15 solicitations asking for $150,000, but closed on gifts totaling only $21,000; and performed at a marginal level on the Senior Leadership Team. (F.F. no. 177.) Huiatt also relieved Fisler of his role as liaison to the Athletic Department development program and his role with the faculty/staff campaign due to Fisler's poor performance, but that reduction in Fisler's job duties did not result in any significant improvement in his performance of his primary job responsibilities. (F.F. no. 178.) Moreover, as of May 2011, the retention of Fisler was causing ripple effects within the Development Office, as other staff members did not feel compelled to perform because they could see Fisler underperforming. (F.F. no. 179.)

Subsequently, Huiatt concluded that due to Fisler's consistently poor job performance and his unwillingness to improve, Huiatt could no longer use Fisler as a field-oriented fundraiser, and there were no other functions within the Development Office that could be assigned to him. (F.F. no. 180.) In June 2011, Huiatt and President Armenti discussed strategies to ensure that they gave Fisler every opportunity to succeed, because President Armenti believed that Fisler was capable of improving his job performance, but just lacked the motivation to do so. (F.F. no. 181.) Huiatt and President Armenti decided to suspend Fisler for 5 days due to his ongoing poor job performance, with the hope that Fisler would recognize the critical need for him to improve his performance. (F.F. no. 182.)

On June 8, 2011, Huiatt met with Fisler and Pamela Murphy, the University's Interim Director of Human Resources, for a pre-disciplinary conference, at which Huiatt reviewed the significant issues related to Fisler's ongoing unsatisfactory job performance. (F.F. nos. 183–84.) Fisler again blamed his shortcomings on the quality of the prospect pool and asserted that he was doing no worse than others in the Development Office. (F.F. no. 185.) Subsequently, by letter dated June 10, 2011, Huiatt notified Fisler that his unsatisfactory job performance warranted a 5–day suspension without pay from June 13, 2011, through June 17, 2011, and Huiatt explained the reasons for the suspension. (F.F. nos. 186–87.) The letter also indicated that Huiatt expected significant improvement in Fisler's job performance between Fisler's return to the Development Office and August 1, 2011, setting forth benchmarks which Fisler was to achieve. (F.F. no. 189.) Specifically, Fisler was expected to improve in the following areas: (1) bring his prospect portfolio up to at least 100 prospects with a gift capacity rating of $25,000 or more; (2) conduct no fewer than 15 personal, face-to-face substantive visits with prospective donors for the purpose of qualification, cultivation, and/or solicitation; (3) conduct at least 4 visits of the 15 minimum that include solicitations for commitments at a level comparable to the prospect's rated gift capacity; (4) close on at least 1 commitment at the

**4.** Notably, Fisler could easily have gone through the pool and replenished his list to 200 or 300 prospects if he wanted. (F.F. no. 175.)

$25,000 level or higher; and (5) close on at least $40,000 in total commitments, including the expected $25,000–plus commitment and those which he had previously submitted, which had not yet been closed, and any that would be submitted during the upcoming 6 weeks. (F.F. no. 189.) The letter also provided that Fisler's continued failure to satisfactorily perform his job duties could lead to his termination from the University. (F.F. no. 190.)

Despite several meetings wherein Huiatt reviewed Fisler's progress and attempted to help Fisler meet the above goals, Fisler did not increase the size of his prospect portfolio from the low 70s or the gift capacity rating of his prospects, conducted only 5 personal face-to-face visits, made only 1 solicitation during the personal prospect visits, and closed on only $100 in commitments. (F.F. nos. 191–92, 196, 198.) At their meeting on August 1, 2011, Huiatt made clear that his expectations had been reasonable and that Fisler's unsatisfactory job performance compelled Huiatt to recommend to President Armenti that Fisler be terminated. (F.F. no. 197.) By memorandum dated August 2, 2011, Huiatt formally recommended terminating Fisler's employment, outlining his

reasons for the recommendation. (F.F. no. 199.) By letter dated August 3, 2011, President Armenti terminated Fisler's employment with the University, reiterating Fisler's unsatisfactory job performance over the past 17 months and his unwillingness to improve despite multiple opportunities to do so, and specifically stating that Fisler was either refusing to perform or not capable of performing the duties and responsibilities of his Senior Associate Vice President position to a satisfactory level.[5] (F.F. no. 201.)

On or about June 29, 2011, Fisler appealed the June 2011 5–day suspension without pay under SSHE's Merit Principles Policy (MPP).[6] On or about July 18, 2011, after retaining counsel, Fisler filed an amended request for merit principles appeal pertaining to the June 2011 suspension. On or about August 24, 2011, Fisler filed a merit principles appeal related to his discharge from the University. Fisler's appeals were consolidated and hearings were held before Hearing Officer Linda Barrett (Hearing Officer Barrett) on December 2, 2011, and December 13, 2011. The University filed its post-hearing brief on March 15, 2012. By letter dated April 9, 2012, Hearing Officer Barrett notified

**5.** The Chancellor further found that it is poor business practice to employ individuals in fundraising when they cannot bring back to the organization at least what it costs to put them in the field; it is not sustainable for a development office to employ a major gifts officer, paid $112,000 in salary plus full benefits while incurring travel expenses, who secures only $21,000 in donations over a 16–month period. (F.F. no. 204.)

**6.** Policy 1983–01–A, adopted May 23, 1983, amended July 15, 1987, and October 9, 1997. As this Court has explained previously, the MPP is

a merit based personnel policy, adopted by the Board of Governors pursuant to Section 2006–A(a)(8) of the [Public] School Code [of 1949, Act of March 10, 1949, P.L. 30, *as*

*amended,* added by the Act of November 12, 1982, P.L. 660], 24 P.S. § 20–2006–A(a)(8). The MPP sets forth principles for policy administration, hearing procedures, employee discipline and notice requirements and other rules governing [SSHE]. The purpose of the general provisions of the MPP is to establish a general personnel policy consistent with merit principles by which [SSHE] universities shall operate. The policy, however, is "not intended to restrict flexibility, discourage innovation, or create any unwarranted regulatory burden within [SSHE]."

*Bumba v. Pa. State Sys. of Higher Educ.*, 734 A.2d 36, 38 (Pa.Cmwlth.1999) (citation omitted) (quoting Section A of the MPP), *appeal denied*, 563 Pa. 621, 757 A.2d 935 (2000).

counsel for both parties that as a result of recent changes to the Office of General Counsel Hearing Officer Program, Senior Hearing Officer Jackie Wiest Lutz (Hearing Officer Lutz) had replaced Hearing Officer Barrett as Chief Hearing Officer, effective April 2, 2012. (Reproduced Record (R.R.) at 162a.) The letter further provided that the matter would be assigned to Hearing Officer Lutz to prepare the proposed adjudication and order for consideration by SSHE. (Id.) On June 15, 2012, Fisler filed his post-hearing brief,[7] indicating in a footnote that he was simultaneously filing a motion for a new hearing, although no such motion was filed at that time, and requesting that he be granted a hearing de novo based on the reassignment of the case from Hearing Officer Barrett to Hearing Officer Lutz. The University filed its reply brief on July 16, 2012, incorporating a response that the motion be denied. On August 9, 2012, Fisler filed his motion for a new hearing and memorandum in support.

Subsequently, a hearing officer[8] issued a proposed adjudication and order, denying Fisler's motion for a new hearing and affirming the University's decision to suspend and subsequently fire Fisler. As noted above, the Chancellor adopted the proposed adjudication as his final adjudication, with the exception of proposed finding of fact number 11. In denying Fisler's motion for a new hearing, the Chancellor primarily relied upon *Cavanaugh v. Fayette County Zoning Hearing Board,* 700 A.2d 1353 (Pa.Cmwlth.1997), and the cases cited therein. (Adjudication at 48–49.) Relying upon those cases, the Chancellor noted that it was not necessary for a fact finder to observe live witness testimony in order to make credibility determinations. (Id.) Moreover, the Chancellor observed that this Court has (1) allowed administrative adjudicators to determine the credibility of testimony from the reading of a transcript, (2) permitted a hearing examiner or presiding officer to take evidence and a board or commission, acting as the ultimate fact finder, to make findings of fact based solely on a review of the record, and (3) ruled that a litigant is not denied due process of law when the ultimate decision in a case is made by an administrative fact finder who did not hear the testimony. (Id. at 49.) The Chancellor, therefore, denied Fisler's motion for a new hearing.

The Chancellor also concluded that the University had just cause to suspend and discharge Fisler under the MPP for poor job performance. He concluded that the findings of fact establish that the basis for the University's suspension and discharge of Fisler was directly related to his job performance, in that he did not, over 17 months, meet the specific performance goals laid out for him in April 2010. (Id. at 61.) The Chancellor determined that,

7. The University objected to Fisler's post-hearing brief on the basis that it was untimely filed, but the objection was overruled by a July 2, 2012 memorandum order accepting Fisler's post-hearing brief.

8. In the summary of the argument section of his brief to this Court, Fisler states that after the case was assigned to Hearing Officer Lutz, Fisler was advised that the case was assigned to Hearing Officer Ruth Dunnewold, and that because the adjudication does not indicate the identity of the hearing officer who wrote it, Fisler is uncertain who rendered the adjudication. Moreover, SSHE does not indicate the identity of the author of the adjudication. Our review of the certified record reveals that Hearing Officer Ruth Dunnewold issued a letter on September 4, 2012, to SSHE's prothonotary, enclosing the proposed adjudication and order for filing. (Certified Record (C.R.), Item No. 60.) Nevertheless, the identity of the author of the proposed adjudication is immaterial for purposes of our analysis and, thus, we will refer to the author of the proposed adjudication as simply "hearing officer."

for that reason, the University's action against Fisler touched in a rational and logical manner upon his competence and ability. (*Id.*) The Chancellor stated that it is the undisputed prerogative of University management to assign job responsibilities, and Fisler did not adequately perform those job responsibilities, so President Armenti and Huiatt exercised their discretion and determined that Fisler's poor performance constituted ample just case for suspension and removal. (*Id.*)

The Chancellor also concluded that the cause (*i.e.,* Fisler's failure to meet articulated performance standards) was personal to Fisler, in that he did not take the necessary steps to secure the necessary visits or to keep his prospect list at the expected level, with the latter being something he admitted he could have done. (*Id.*) The Chancellor determined that, under the circumstances, the situation was unsustainable and a poor business practice, because Fisler was not bringing back to the University at least what it cost to put him in the field, and because his retention was causing ripple effects within the Development Office, as others did not feel compelled to perform because they could see that Fisler was underperforming. (*Id.*) The Chancellor determined that all of that rendered Fisler unfit for his position, so his termination was justifiable and for the good of the organization. (*Id.*) The Chancellor, therefore, concluded that the University had demonstrated by a preponderance of the evidence that the University had just cause to suspend and terminate Fisler for poor job performance. (*Id.*) Consequently, he concluded that the University had satisfied its burden of establishing a *prima facie* case of just cause.

The Chancellor also rejected Fisler's arguments pertaining to his contention that the University did not have just cause to suspend and subsequently discharge Fisler and, instead, used its just cause explanation as a pretext for its actions. Specifically, the Chancellor rejected Fisler's arguments that the University took action against him because of his age and because it was retaliating against him for filing complaints against the University or for applying for the Vice President position. (*Id.* at 62–63, 83.) The Chancellor also rejected Fisler's claims that the University, in bad faith, set out to force Fisler out of his employment for some unknown reason unrelated to work performance by subjecting him to an unpleasant and oppressive work environment, giving him a *de facto* demotion, imposing on him and no one else unrealistic quantitative and qualitative metrics or standards designed to cause him to fail in light of the poor quality of his prospect portfolio, and unfairly characterizing him as a recalcitrant and irresponsible employee. (*Id.* at 63–82, 85–87.) Finally, the Chancellor rejected Fisler's argument that the University had some bad faith motivation to take action against Fisler related to the 2009 Vice President search, further noting that Fisler's failure to succeed in his bid for the Vice President position was irrelevant to his performance from April 2010 to August 2011. (*Id.* at 82–84.)

■ Fisler appealed the Chancellor's decision to this Court. On appeal,[9] Fisler argues that the Chancellor violated Fisler's due process rights by denying his motion for a new hearing and allowing a hearing officer who did not preside over the hearings below to issue proposed findings of fact and render a decision based on

---

9. "This Court's scope of review is limited to determining whether there has been a violation of constitutional rights, whether errors of law have been committed, and whether necessary findings of fact are supported by substantial evidence." *Bumba,* 734 A.2d at 37 n. 1.

the record. Fisler also argues that many of the findings of fact as adopted by the Chancellor are not supported by substantial evidence and that there is insufficient, credible evidence to support a finding of just cause.

We first address Fisler's argument that the Chancellor violated Fisler's due process rights by denying his motion for a new hearing and allowing a hearing officer who did not preside over the hearings below to issue proposed findings of fact and render a decision based on the record.[10] In support of his argument, Fisler relies on nonbinding authority prohibiting the substitution of another judge for the trial judge without the parties' consent "where the testimony has been heard without a jury and the trial judge has not yet rendered a decision on the factual issues." *See, e.g., Ciaffoni v. Ford*, 211 Pa.Super. 472, 237 A.2d 250 (1968); *Hyman v. Borock*, 211 Pa.Super. 126, 235 A.2d 621 (1967); *see also Commonwealth v. Claney*, 113 Pa.Super. 439, 173 A. 840 (1934) (ordering new trial in matter tried before jury because trial judge was replaced by another judge "for the purpose of charging the jury and receiving the verdict," among other things, after testimony was taken and closing arguments were heard). Fisler also cites nonbinding authority providing, in essence, that the credibility of testifying witnesses can only be determined by a tribunal that observed the witnesses' live testimony and that litigants are entitled to a decision by that tribunal. *See, e.g., Commonwealth ex rel. Davis v. Davis*, 268 Pa.Super. 401, 408 A.2d 849 (1979); *Anderson v. Kohler*, 376 Ill.App.3d 714,

315 Ill.Dec. 623, 877 N.E.2d 110 (2d Dist. 2007). Fisler argues that because a hearing officer in an administrative proceeding acts in the same manner as a trial judge acting without a jury, an administrative agency cannot substitute a new hearing officer to write the decision for the original hearing officer, who was the only one to hear the testimony live and who had not yet rendered a decision on the factual issues in the case. Fisler contends that a hearing officer cannot make informed factual findings based on a transcript alone without violating the due process rights of the litigants, because there are critical factors to be considered in making credibility determinations that are unique to observing live witness testimony. Moreover, Fisler argues that Section 504 of the Administrative Agency Law[11] guarantees that the trier of fact who renders a decision must be the person who actually presided over a case and enjoyed the benefit of hearing and seeing the witnesses. Furthermore, Fisler distinguishes this matter from *Cavanaugh* and many of the cases cited therein, noting that in those cases, either the reviewing body relied on a record in which someone who had actually been present at the hearing initially made findings of fact and credibility determinations, or at least one member of the reviewing body had conducted the hearing(s) below. Fisler argues that, unlike the parties in those cases, Fisler never received an adjudication by a hearing officer who actually heard witnesses testify and made credibility findings based upon the hearing officer's observation of witnesses and that these circumstances are particularly signif-

---

10. We note that for purposes of this appeal, the parties proceed as if Fisler has a property right or liberty interest in his continued employment at the University, which is entitled due process protection. Because the University does not argue otherwise, we will not further examine this topic.

11. 2 Pa.C.S. § 504 (providing, in part, that "[n]o adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard").

icant in this matter because the outcome hinges upon credibility determinations.

We conclude that the substitution of a new hearing officer for Hearing Officer Barrett did not violate Fisler's due process rights. It is well-settled that "the constitutional guarantees of due process apply equally to proceedings before administrative tribunals," and that "[t]he basic requirements of due process are notice and an opportunity to be heard." *Gow v. Dep't of Educ.*, 763 A.2d 528, 533 (Pa.Cmwlth. 2000), *appeal denied*, 566 Pa. 651, 781 A.2d 149 (2001). Nevertheless, administrative proceedings "must comply with a different set of standards to satisfy due process requirements."[12] *R. v. Dep't of Pub. Welfare*, 535 Pa. 440, 445–46, 636 A.2d 142, 144 (1994). Those standards, set forth by our Supreme Court in *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383 (1985), require that the fact finder's decision be "subject to judicial review on the substantial evidence test" and be explained "in sufficient detail to permit meaningful appellate review." *Peak*, 509 Pa. at 278, 501 A.2d at 1389.

Moreover, both our Supreme Court and this Court have held that a litigant's due process rights are not violated in the context of an administrative proceeding wherein a hearing officer who issued an adjudication or recommendation was not present for the entire hearing below. For example, in *R.*, one hearing examiner presided over the first four days of hearings, while a second hearing examiner presided over the fifth day of hearings and then issued a recommended adjudication, which

the Dep Hearings and Appeals adopted in full. *R.*, 535 Pa. at 445, 636 A.2d at 144. In rejecting the appellant's due process argument, the Supreme Court explained:

> Because the Office of Hearings and Appeals, not the hearing examiner, is the ultimate finder of fact in this case, it is of no moment that the hearing examiner who issued the Adjudication and Recommendation did not hear the testimony given during the first four days of hearings. The hearing examiners are assistants who are constitutionally permitted to help the agency by taking, sifting through, and analyzing evidence.

*Id.* at 445–47, 636 A.2d at 144–45. The Supreme Court further explained that "[t]he critical issue is whether there are sufficient safeguards, as measured by Peak, to protect against arbitrary action by the Office of Hearings and Appeals." *Id.* at 447, 636 A.2d at 145. The Supreme Court concluded that the safeguards articulated in Peak were met in R. *Id.*

*Gow* also involved two different hearing officers hearing separate portions of the petitioner's case. As a consequence of these circumstances, the petitioner argued on appeal to this Court that he was denied a fair and impartial hearing. *Gow*, 763 A.2d at 531. In rejecting this argument, we explained:

> The replacing of the hearing officer during the hearing did not prejudice [the petitioner]. The new hearing officer reviewed the testimony taken prior to his appointment. That is sufficient, as [the petitioner] did not allege that the

---

12. Fisler also contends that the Chancellor erred in concluding that case law from the Superior Court of Pennsylvania is inapposite in this administrative action, as in the past, this Court has looked to such decisions in finding a violation of due process. *See Wasiolek v. City of Philadelphia*, 146 Pa.Cmwlth. 582, 606 A.2d 642 (1992). *Wasiolek* is distinguishable, however, because it involved a judicial proceeding rather than an administrative proceeding. Moreover, although we may look to Superior Court decisions for guidance, those decisions are not binding on this Court. *Muntz v. Dep't of Transp.*, 157 Pa.Cmwlth. 514, 630 A.2d 524, 525 (1993).

hearing officer was not impartial. A hearing officer may make findings, including witness credibility, without being present for the entire hearing. . . . Due process does not require that the actual determinations be made by the person hearing the evidence in all administrative proceedings.

*Id.* at 533. Relying upon *R.*, this Court concluded that because the Professional Standards and Practices Commission of the Department of Education, and not the hearing examiner, was the ultimate fact finder in that case, "it [wa]s of no moment that the hearing officer who issued the decision did not hear the testimony given during the entire hearing." *Id.* at 534.

 Here, Fisler concedes that the Chancellor is the ultimate fact finder in proceedings brought under the MPP by university employees. Consequently, for purposes of this appeal, we will analyze this issue under the assumption that the Chancellor is the ultimate fact finder in such proceedings. We also note that Section L(1) of the MPP authorizes the Chancellor "to retain hearing officers to conduct hearings and issue recommendatory adjudications." Nevertheless, the Chancellor, as the ultimate fact finder, is not bound by the decision of the hearing officer. *See*

*Realmuto v. Dep't of Transp.*, 161 Pa. Cmwlth. 613, 637 A.2d 769, 771 (1994) (Secretary of Transportation, as ultimate fact finder, is not bound by proposed report of hearing examiner); *Fitz v. Intermediate Unit # 29*, 43 Pa.Cmwlth. 370, 403 A.2d 138, 141 (1979) ("Absent a requirement that the agency head is bound by the decision of the hearing examiner, the agency head is free to make his own determination and findings subject to review by this Court."). Thus, because the Chancellor, and not the hearing officer, is the ultimate fact finder in this matter, the fact that the hearing officer who issued the proposed adjudication and order in this case did not hear the testimony given during the hearings is of no consequence.[13] Additionally, the due process requirements outlined in *Peak* are met in this case, as the Chancellor's decision is subject to review under the substantial evidence standard, and the 87–page decision adopted by the Chancellor provides ample explanation to permit meaningful appellate review. Thus, we perceive no violation of Fisler's due process rights.[14]

We next address Fisler's argument that many of the findings of fact as adopted by the Chancellor are not supported by substantial evidence.[15] In his brief, Fisler

---

13. We also note that:

> While a fact finder's observation of the demeanor of a witness has traditionally been viewed as an important factor in determining credibility, administrative adjudicators are permitted to determine the credibility of testimony from the reading of a transcript. Administrative agencies often use a system of adjudication where a hearing examiner or presiding officer takes evidence and the ultimate fact finder is a board or commission, which has the power to make findings of fact based solely on a review of the record. An adjudicative method where the ultimate decision in a case is made by an administrative fact finder who did not hear the testimony does not deny a litigant due process of law.

*Cavanaugh*, 700 A.2d at 1355–56 (citations omitted) (footnote omitted).

14. Notwithstanding our conclusion above, we sympathize with Fisler's argument that he never received the benefit of a decision written by someone who actually observed *any* of the live witness testimony given at the hearings in this matter. Nevertheless, in light of binding precedent, we feel constrained to hold that the procedural circumstances of this case do not result in a violation of Fisler's due process rights.

15. "Substantial evidence is any relevant evidence that a reasonable mind might consider adequate to support a conclusion." *Bumba*, 734 A.2d at 37 n. 1. "In the course of per-

purports to contest 40 of those findings. Although Fisler does indeed challenge some of these findings on the basis that the findings are not supported by substantial evidence,[16] a vast majority of Fisler's challenges more accurately amount to an argument that, with respect to several findings, the Chancellor [17] inexplicably elected to credit and accept testimony by the University's witnesses while ignoring conflicting or unrebutted testimony and evidence that was presented on Fisler's

16. Fisler challenges finding of fact number 132, which provides that when Huiatt provided the April 2010 letter to Fisler, Fisler accepted the described job responsibilities and did not balk or object to them, nor did he state that the goals were unreasonable or suggest alternative goals, because 12 visits a month is a feasible goal with the appropriate prospect list. Fisler argues that this finding is misleading, because Huiatt never stated that he provided a numeric target nor did he determine whether such a target was feasible. Furthermore, Fisler testified not that he accepted a target, but rather that he thought he had no recourse in objecting.

At the hearing, Huiatt testified that he provided Fisler with a letter in April 2010 outlining Fisler's responsibilities as the Senior Associate Vice President and that Fisler accepted that responsibility. (R.R. at 6a.) Huiatt further testified that Fisler received a listing of about 100 prospects that were selected from a pool of 4,000 prospects, which had previously been rated by a consulting firm for Fisler in the years prior to his arrival, and that Fisler did not balk or object to taking on those responsibilities or say that the goals were unreasonable. *Id.* Huiatt also testified that these goals were reasonable. (R.R. at 13a.) That letter, which was admitted into the record, similarly shows the various responsibilities given to Fisler, including having 12 face-to-face meetings with prospects a month, on average. (Supplemental Reproduced Record (S.R.R.) at 25b.) With regard to the responsibilities listed in the April 2010 letter, Fisler testified that an average of 12 visits a month was a bit on the

forming a substantial evidence analysis, this court must view the evidence in the light most favorable to the prevailing party. Moreover, we are to draw all reasonable inferences that can be drawn from the evidence in support of the factfinder's decision in favor of the prevailing party." *LT Int'l Beauty Sch., Inc. v. Bureau of Prof'l & Occupational Affairs,* 13 A.3d 1004, 1009 (Pa.Cmwlth.2011) (citation omitted).

high side, but that it was feasible with the appropriate prospect list. (R.R. 127a–28a.) Fisler also testified that he did not complain about these duties because he "thought we were pretty much signed, sealed and delivered, and ... there was probably not a reason to revisit that," so he took other avenues to pursue his complaints. (*Id.* at 128a.) Thus, we agree with Fisler that to the extent finding of fact number 132 represents that Fisler did not object to the responsibilities given to him in April 2010 *because* 12 visits a month is a feasible goal with the appropriate prospect list, that finding is not supported by substantial evidence. Nevertheless, the record supports finding of fact number 132 in all other respects.

With respect to Fisler's substantial evidence challenges to finding of fact numbers 5 and 67, we conclude that, upon review, these findings are not necessary to the adjudication. Thus, we need not address Fisler's challenges to those findings. *See Keay v. Unemployment Comp. Bd. of Review,* 122 Pa.Cmwlth. 116, 551 A.2d 391, 392 (1988) ("This Court's duty to insure that findings are supported by substantial evidence is limited to a review of *necessary* findings" (emphasis in original)); *see also Borough of Schuylkill Haven v. Prevailing Wage Appeals Bd.,* 6 A.3d 580, 585 (Pa.Cmwlth.2010) ("It is well established within our jurisprudence that an unsupported finding of fact which is not necessary to the adjudication merely constitutes harmless error."), *appeal denied,* 610 Pa. 628, 22 A.3d 1035 (2011). Moreover, to the extent that Fisler presents cognizable substantial evidence challenges to finding of fact numbers 154, 178, and 188, we conclude that, upon review of the record references provided by the Chancellor, these findings of fact are supported by substantial evidence.

17. Although Fisler refers to the hearing officer in making his arguments contesting the factual findings, we note that his arguments actually apply to the Chancellor as the ultimate fact finder.

behalf or otherwise favorable to Fisler. Fisler also argues that in rendering certain findings of fact, the Chancellor relies on only portions of testimony by witnesses for both the University and Fisler while disregarding other portions. As a consequence, Fisler argues, the Chancellor issued inaccurate, misleading, or incomplete findings, or failed to make certain additional necessary findings of fact altogether. Moreover, in some instances, Fisler fails to challenge the particular finding of fact at all, instead using a substantial evidence challenge as an opportunity to advance arguments and evidence in support of his positions regarding the findings of fact the Chancellor *should have made* or conclusions the Chancellor *should have reached.*

Fisler's arguments largely pertain to the weight the Chancellor assigned to the evidence and the Chancellor's credibility determinations and fail to show that the Chancellor's findings are unsupported by substantial evidence. "[M]atters of credibility and evidentiary weight are within the exclusive discretion of the fact-finder below, and are not within our scope of review." *Carr v. State Bd. of Pharmacy,* 48 Pa.Cmwlth. 330, 409 A.2d 941, 944 (1980). In other words, "[a]s a reviewing court, this Court may not reweigh the evidence and substitute our judgment for that of the fact-finder." *Commonwealth v. Hoffman,* 938 A.2d 1157, 1160 n. 10 (Pa.Cmwlth.2007). Moreover, where the Chancellor's decision itself implicitly provides a clear indication of which witnesses the Chancellor credited, the Chancellor is not required to make explicit credibility determinations. *See Forest Area Sch. Dist. v. Shoup,* 153 Pa.Cmwlth. 423, 621 A.2d 1121, 1124 (1993) ("In a case involving the dismissal of a professional employee of a school district, [where] the Secretary [of Education] is the ultimate factfinder[,] . . . .

[t]he Secretary is not required to make specific findings as to the credibility of each and every witness where the decision itself reflects which witnesses were believed and upon whose testimony the Secretary relied."). Furthermore, with respect to Fisler's argument that the Chancellor disregarded conflicting or unrebutted testimony or parts thereof, we note that "the fact-finder is free to believe all, part or none of the evidence presented," even if uncontradicted, and that "[i]t is the job of the fact finder to resolve conflicts in testimony." *Hoffman,* 938 A.2d at 1160 n. 10; *Allied Mech. & Elec., Inc. v. Pa. Prevailing Wage Appeals Bd.,* 923 A.2d 1220, 1228 (Pa. Cmwlth.2007); *Bucks Cnty. Children & Youth Soc. Servs. Agency v. Dep't of Pub. Welfare,* 151 Pa.Cmwlth. 110, 616 A.2d 170, 174 (1992). "[T]he presence of conflicting evidence in the record does not mean that substantial evidence is lacking." *Allied Mech. & Elec., Inc.,* 923 A.2d at 1228.

Additionally, this Court has previously stated:

A reviewing court has the discretion to determine whether the findings that accompany an administrative agency adjudication are sufficient. However, an administrative agency is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected. The findings need only be enough to enable the Court to determine the questions and ensure that the conclusions follow from the facts.

*Krebs Chrysler–Plymouth, Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons,* 655 A.2d 190, 194 (Pa.Cmwlth.1995) (citations omitted).

Here, the Chancellor found that after the University hired Huiatt, Huiatt undertook a review of the Development

Office and, with the approval of President Armenti, created a restructuring plan in which Fisler was named Senior Advisor and Senior Associate Vice President for Special Initiatives and divested of his responsibility to manage the Development Office staff. (F.F. nos. 73, 76–78, 85–87). These findings are supported by Huiatt's and President Armenti's testimony as well as documents regarding the organizational changes at the University. (R.R. at 5a–6a, 16a, 28a, 49a; S.R.R. at 12b, 16–18b.) After an unsuccessful mediation session conducted in an attempt to address the reorganization and Fisler's concerns about his role at the University, Huiatt, in consultation with President Armenti, decided to utilize Fisler as a lead field officer. (F.F. nos. 106, 114, 121.) These findings are supported by Huiatt's testimony, Dr. McBride's testimony, President Armenti's testimony, and an April 2, 2010 letter issued by Dr. McBride to Huiatt and Fisler regarding the outcome of the mediation session. (R.R. at 6a, 42a–44a, 51a; S.R.R. at 161b–65b.) In April 2010, because of his concerns regarding Fisler's recalcitrance, Huiatt provided Fisler with specific job duties to perform and goals to meet. (F.F. nos. 122, 124–25.) These findings are supported by Huiatt's testimony, Fisler's testimony, and the April 7, 2010 letter itself. (R.R. at 6a–7a, 94a–95a, 127a; S.R.R. at 24b–26b.)

Fisler failed to perform these duties adequately or meet the goals over the course of more than a year, despite multiple warnings from the University that his performance was falling below expectations and efforts by the University to facilitate Fisler's improvement. (F.F. nos. 152, 158, 159–60, 163, 166, 168, 174, 178, 186, 190–92, 198, 200.) Again, these findings are supported by Huiatt's and Fisler's testimony, progress meeting notes, and written correspondence between Fisler and Huiatt and Huiatt and President Armenti. (R.R. at 9a–10a, 12a–14a, 19a, 98a–100a, 103a, 129a; S.R.R. at 66b–67b, 73b, 89b, 103b, 105b, 117b, 143b, 149b–50b, 154b–57b.) Although Fisler asserted that he was doing no worse than other staff members of the Development Office and that he had been given a lower quality prospect portfolio, the University expected him to be a leader as a result of his experience and high-ranking position, to find other prospects with which to work as he disqualified the prospects initially given to him, and to achieve more visits. (F.F. nos. 140–41, 145, 161, 167, 171, 185.) These facts are evidenced in Huiatt's testimony, Fisler's testimony, weekly progress reports, written correspondence from Huiatt, and notes regarding Fisler's pre-disciplinary conference. (R.R. at 8a–10a, 12a, 37a, 104a, 106a–07a, 111a, 130a–31a, 136a; S.R.R. at 73b, 113b–14b, 143b–44b, 149b.)

As a result of Fisler's poor job performance, the University suspended Fisler for 5 days, from June 13, 2011, through June 17, 2011, with the hope that Fisler would understand the need for him to improve his job performance. (F.F. nos. 182, 186, 190.) These findings are supported by Huiatt's testimony, President Armenti's testimony, and the suspension letter issued to Fisler. (R.R. at 11a–12a, 52a; S.R.R. at 149b–50b.) The suspension letter provided that when Fisler returned from his suspension, he was to meet a new set of outlined goals by August 1, 2011. (F.F. no. 189.) These goals are evidenced in the letter itself, as well as in the testimony of Huiatt and Fisler. (R.R. at 11a–12a, 112a; S.R.R. at 150b.) Nevertheless, Fisler's job performance continued to fall below expectations after his return to work, (F.F. no. 198), as evidenced by Huiatt's testimony and Huiatt's August 2, 2011 memorandum to President Armenti recommending Fisler's termination. (R.R. at 14a; S.R.R. at 157b.) Subsequently, the University dis-

charged Fisler, explaining in the termination letter that his discharge was due to his poor job performance and that Fisler was either refusing to perform or not capable of performing the duties and responsibilities of his position to a satisfactory level, (F.F. no. 201), as evidenced in the August 3, 2011 letter itself, (S.R.R. at 160b). In sum, upon review of the evidence, which, as noted above, we view in the light most favorable to the University, we conclude that the necessary findings of fact are supported by substantial evidence.[18]

Finally, we address Fisler's argument that there was insufficient, credible evidence to support a finding of just cause. Fisler argues, in essence, that the Chancellor erred in concluding that the University met its burden to prove that it had just cause to fire Fisler, because the Chancellor selectively chose testimony supporting the University's position while ignoring the testimony from Fisler and his witnesses that contradicts or rebuts the University's testimony without explanation and without making credibility determinations. Fisler further argues that in the absence of such explanation or determinations, there is insufficient evidence to support a finding of just cause.

Fisler failed to preserve this issue in his petition for review and, thus, it is waived. *See Pa. State Troopers Ass'n v. Pa. Labor Relations Bd.*, 39 A.3d 616, 622 (Pa.Cmwlth.2012) ("Issues not raised or 'fairly comprised' within the petition for review are deemed waived."); Pa. R.A.P. 1513(d). Nevertheless, even if Fisler had not waived this issue, we would reject Fisler's arguments. As noted above, the Chancellor, as fact finder, is free to believe all, part, or none of the evidence presented, even if uncontradicted, and is tasked with resolving conflicts in testimony. Moreover, despite Fisler's argument to the contrary, the Chancellor is not required to explain in detail his rationale for rejecting the testimony presented on Fisler's behalf or make explicit credibility determinations. Thus, Fisler's arguments are without merit.

Furthermore, the Chancellor did not err in concluding that the University had just cause to suspend and later discharge Fisler. Under Section G(1) of the MPP, "[n]o regular employee shall be terminated from employment or otherwise disciplined except for just cause." Moreover, "[a]n employee may be terminated from employment for refusal or inability to perform the prescribed duties of his/her position, for willful misconduct, negligence, or any oth-

18. Furthermore, we note that in *Grenell v. State Civil Service Commission*, 923 A.2d 533 (Pa.Cmwlth.2007), we stated:

[T]his Court may conclude that an adjudicator has capriciously disregarded competent evidence when the unsuccessful party below has presented "overwhelming evidence" upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence.

In other words, where there is strong "critical" evidence that contradicts evidence supporting a contrary determination,

the adjudicator must provide an explanation as to how it made its determination. The ultimate question is whether an adjudicator "has failed to give a proper explanation of overwhelming critical evidence."

*Grenell*, 923 A.2d at 538 (quoting *Frog, Switch & Mfg. Co. v. Pa. Human Relations Comm'n*, 885 A.2d 655, 667 (Pa.Cmwlth.2005)). Fisler fails to argue explicitly that the Chancellor erred as a matter of law by capriciously disregarding evidence and, nonetheless, we discern no error in this regard, as Fisler fails to present overwhelming evidence upon which the Chancellor could have reached a contrary conclusion, and the Chancellor provides a thorough explanation as to how he made his determination.

er similar reason." Section G(4)(c) of the MPP. "In cases involving ... terminations from employment, the appointing authority shall have the burden of proof and the burden of going forward to establish a *prima facie* case." Section L(3) of the MPP. "The standard of proof shall be that of a preponderance of evidence," meaning "evidence sufficient to convince a reasonable mind that a matter is more likely than not true." Section L(5) of the MPP.

Although the MPP does not define "just cause," this Court has defined the term as follows:

> Just cause must be merit-related, and the criteria for determining whether an appointing authority had just cause for removal must touch upon the employee's competency and ability in some rational and logical manner.
>
> What constitutes just cause for removal is largely a matter of discretion on the part of the head of the department. "However, to be sufficient, the cause should be personal to the employee and such as to render the employee unfit for his or her position, thus making dismissal justifiable and for the good of the service."

*Perry v. State Civil Serv. Comm'n*, 38 A.3d 942, 951 (Pa.Cmwlth.2011) (citations omitted) (quoting *Pa. Bd. of Prob. & Parole v. State Civil Serv. Comm'n*, 4 A.3d 1106, 1112 (Pa.Cmwlth.2010)).[19]

Here, the Chancellor ultimately found that the University suspended and subsequently discharged Fisler as a result of his poor job performance over an extended period of time following repeated warnings relating to his poor job performance. Continuing and regular poor job performance in the face of repeated warnings certainly meets the requirements for a just cause termination. *See, e.g., Wei v. State Civil Serv. Comm'n*, 961 A.2d 254, 259 (Pa.Cmwlth.2008) (holding that employee's "insubordination and [continued] unsatisfactory work performance provided just cause for [employee's] removal" where employee "failed to complete or make progress on the project given to him, even though he was capable of doing such project, was offered help on the project, was relieved of certain duties in order to complete the project and had been reprimanded for not having completed the project"), *appeal denied*, 601 Pa. 705, 973 A.2d 1008 (2009). Thus, the Chancellor did not err in concluding that the University had just cause to suspend and subsequently fire Fisler.

Accordingly, we affirm the order of the Chancellor.

### ORDER

AND NOW, this 17th day of October, 2013, the order of the Chancellor of the State System of Higher Education is hereby AFFIRMED.

---

**19.** Notably, the standard for establishing just cause differs from the standard for establishing willful misconduct:

> Just cause may be established by [a] showing of conduct establishing that the employe[e] lacks the competency and ability to perform the duties of his position.... Wil[l]ful misconduct imports the requirement that the employe[e]'s actions leading to loss of employment be shown to have wil[l]fully disregarded the employer's interest, deliberately violated its rules, or was so grossly negligent as to have manifested culpability, wrongful intent or evil design.

*Perry*, 38 A.3d at 953 (alterations in original) (quoting *Lebanon Cnty. Bd. of Assistance v. Unemployment Comp. Bd. of Review*, 16 Pa. Cmwlth. 558, 332 A.2d 888, 889 (1975)).