Richard MARTIN Petitioner,

v.

STATE CIVIL SERVICE COMMISSION (DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT), Respondent.

Commonwealth Court of Pennsylvania.

Argued April 15, 1999.
Decided Aug. 31, 1999.
Publication Ordered Nov. 15, 1999.

Debra K. Wallet, Camp Hill, for petitioner.

Nancy J. Kippenhan, Harrisburg, for respondent.

Before DOYLE, J., LEADBETTER, J., and McCLOSKEY, Senior Judge.

LEADBETTER, Judge.

Richard Martin appeals from the order of the State Civil Service Commission (Commission) dismissing his appeal from the decision of the Department of Community Affairs (DCA) to furlough Martin from his position as a Municipal Police Consultant 2 in the Bureau of Local Government Services (BLGS). Martin contends that: (1) the DCA deprived him of due process by not providing a pre-furlough hearing and by stating that the furlough was for lack of funds but adjudicating on the basis of lack of work; (2) the furlough violated the personnel transfer provision in the statute effecting the reorganization of the DCA; (3) the evidence was insufficient to justify the furlough; and (4) the Commission erred in dismissing Martin's claim for discrimination based on age, union affiliation and civil service status.

In March of 1995, to effectuate the general goal of streamlining the departments of the executive branch of government, the Governor proposed the elimination of DCA and the re-allocation of its duties for better efficiency.[1] After receiving notification of this goal, DCA management, working with the Governor's Office of Administration, developed a plan to reduce the level of staffing at DCA preparatory to the orderly transfer of functions from DCA to other executive agencies.[2] Pursuant to the plan, the BLGS, to which Martin was assigned, was targeted for elimination. Most of the functions previously performed by DCA were assigned to the Department of Commerce. Subsequently, the Department of Commerce became the Department of Community and Economic Development (DCED) pursuant to the Community and Economic Development Enhancement Act (DCED Act), Act of June 27, 1996, P.L.

---

1. The Department of Community Affairs was established by the General Assembly in 1966 to act within state government as an advocate for local government concerns. In 1995, when Governor Ridge announced his proposed elimination of the Department, it employed 242 persons and maintained regional offices in Philadelphia, Pittsburgh, Harrisburg, Erie and Scranton.

2. The plan for dismantling DCA called for the transfer of DCA functions to the Department of Commerce, the Department of Labor and Industry, the Governor's Local Government Service Team and the Pennsylvania Emergency Management Agency. The plan called for the Governor's Local Government Service Team to be created by executive order. However, this Team never came into existence; rather, the functions intended for the Team were assigned to the Center for Local Government Services, an agency within the Department of Community and Economic Development. The Department of Commerce was renamed the Department of Community and Economic Development pursuant to Section 104 of the DCED Act, 71 P.S. § 1709.104.

403, 71 P.S. §§ 1709.101–1709.2106. Some of the consulting, training and technical assistance functions previously performed by the BLGS were assigned to the Center for Local Government Services (CLGS), an agency established within the Department of Community and Economic Development to serve as a link between the Commonwealth and local governments. DCED Act, 71 P.S. § 1709.301(c).[3]

DCA notified Martin, by letter dated May 28, 1996, that he would be furloughed on June 28, 1996. The letter stated that Martin's position was not among the one hundred positions funded for the 1996–1997 fiscal year. On June 13, 1996, Martin filed an Appeal Request with the Commission challenging his furlough under both Sections 951(a) and (b) of the Civil Service Act, Act of August 5, 1941, P.L. 752, added by, the Act of August 27, 1963, P.L. 1257, *as amended,* 71 P.S. § 741.951.[4] Under Section 951(a), Martin challenged his furlough on the grounds that: (1) it was not justified by lack of funds or lack of work; and (2) it violated the personnel transfer provisions of the DCED Act, the statute creating the new agency, DCED. Under Section 951(b), Martin asserted discrimination based on his labor union affiliation and on his age. The Hearing Officer allowed Martin to also present evidence of discrimination based on civil service status. The Commission found that the furlough was justified by a lack of work resulting from a good faith effort to downsize and reorga-

nize. The Commission further found that nothing in the DCED Act operated to void an already-initiated reorganization. Finally, the Commission found that Martin failed to present evidence sufficient to establish a prima facie case of discrimination. The Commission sustained the furlough. Martin appealed.

■ In general, our review of the decision of the Civil Service Commission is to determine whether necessary findings of fact are supported by substantial evidence and whether the Commission's decision is devoid of errors of law. *Eastern Pa. Psychiatric Inst., Dep't of Pub. Welfare v. Russell,* 77 Pa.Cmwlth. 390, 465 A.2d 1313, 1317 (1983). We will not disturb the Commission's determinations regarding credibility or the weight of evidence. *Balas v. Department of Pub. Welfare (Balas II),* 151 Pa.Cmwlth. 53, 616 A.2d 143, 148 (1992). In the instant case, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to DCA, as the prevailing party. *See, e.g., Doerr v. Liquor Control Bd.,* 88 Pa. Cmwlth. 610, 491 A.2d 299, 302 (1985).

## HEARING AND NOTICE

■ Martin's first contention, that he was deprived of due process by the lack of a pre-furlough *Loudermill*-type hearing, was waived by his failure to raise the issue in his petition for appeal to the Commis-

3. Section 301(c), in pertinent part, states the responsibilities of the Center as follows: "The center shall be a provider of services to local governments, shall serve as the point of contact for local governments on issues and problems of local concern, shall be responsible for coordinating State program resources in response to local issues and problems and shall establish a systematic process for addressing local issues and problems involving the resources of more than a single agency." 71 P.S. § 1709.301(c).

4. Section 951 states:
   (a) Any regular employe in the classified service may, within twenty calendar days of receipt of notice from the appointing au-

thority, appeal in writing to the commission. Any permanent separation, suspension for cause, furlough or demotion on the grounds that such action has been taken in his case in violation of the provisions of this act, upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.
   (b) Any person who is aggrieved by an alleged violation of section 905.1 of this act may appeal in writing to the commission within twenty calendar days of the alleged violation. Upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.
71 P.S. § 741.951.

sion.[5] A facial constitutional challenge to a statute may be raised for the first time in a petition for review of an adjudication of a Commonwealth agency. Pa. R.A.P. 1551(a)(1). *See also State Police, Bureau of Liquor Control Enforcement v. Beer & Pop Warehouse, Inc.*, 145 Pa.Cmwlth. 355, 603 A.2d 284, 286 n. 1 (1992). However, the issue of a due process right to a pre-furlough hearing, raised by Martin for the first time before this court, does not concern the validity of a statute nor does it fit within any other exception to the general rule that no question shall be heard or considered by the court which has not been raised before the government unit. Pa. R.A.P. 1551.

■ Under Section 802 of the Civil Service Act, only two reasons justify a furlough, a lack of work or a lack of funds.[6] The Civil Service Act does not require that the notice of furlough state the reasons therefore. However, the Department was obligated under the Governor's Management Directive 580.11[7] to state the reasons for furlough in its notice to each furloughee. *See Reneski v. Department of Pub. Welfare*, 84 Pa.Cmwlth. 226, 479 A.2d 652 (1984) (concluding management directives announcing detailed policies and procedures governing seniority and reemployment rights of furloughees of Department of Public Welfare have the force of law). Martin argues that this directive required that the notice letter state specifically whether the furlough was for lack of work or lack of funds. The furlough letter Martin received stated that for fiscal year 1996–1997, his position would not be funded. Martin asserts that due process principles dictate that his employer should have been limited to proving only a lack of funds and should not have been permitted to justify the furlough on the basis of lack of work.[8]

■ It is generally true that due process in administrative proceedings, as well as judicial proceedings, requires a degree of precision in a notice that sufficiently informs as to the grounds for seeking to deprive an individual of a liberty or property interest. *See, e.g., Begis v. Industrial Bd. of Dep't of Labor and Indust.*, 9

5. In any event, the issue is without merit. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that, under the Due Process Clause, an employee with a property interest in his employment, i.e. one who can be dismissed only for cause, must be afforded an opportunity to be heard prior to the termination of employment. In determining that an employee must have some pretermination opportunity to present his side of the story, the Court weighed the interest of the employee in continued employment and the risk of an erroneous termination against the employer's interest in prompt removal of unsatisfactory employees without undue administrative burdens. The furlough of an employee is based on lack of funds or lack of work and is premised on concerns for efficient workplace operation rather than removal from the job because of personal wrongdoing on the part of the individuals furloughed. In the context of a furlough action the balance of interests shifts. The employee's need to defend himself against allegations of wrongdoing is absent and the employer's interest in an economically efficient workplace is more likely to involve broader concerns than those engendered by the removal of a single unsatisfactory employee. Each furloughee, if given the opportunity to contest the grounds for furlough in a *Loudermill*-type proceeding, could unduly impede an employer's efforts toward greater efficiency. On balance, a *Loudermill*-type hearing is not warranted in the context of a furlough action.

6. A furlough is defined at Section 3 of the Civil Service Act as "the termination of employment because of lack of funds or lack of work." 71 P.S. § 741.3(s).

7. Management Directive 580.11 provides, in pertinent part:

   2. POLICY.
      a. Advance written notification shall be furnished classified service employees for personnel actions listed in Enclosure 1. [furlough is among the personnel actions listed in Enclosure 1]. . . .
      b. Notices must provide the reason(s) for the action being taken and appeal rights, if appropriate. . . .

8. The Commission did not address this issue. However, Martin arguably preserved the issue by asserting it in his brief to the Commission.

Pa.Cmwlth. 558, 308 A.2d 643 (1973) (holding that notice of hearing to consider revocation of elevator inspector's commission must state the charges with specificity). This is true because an individual is entitled to know with reasonable specificity the nature of the charges he must defend against. *Department of Pub. Welfare v. Magrath*, 14 Pa.Cmwlth. 257, 321 A.2d 403, 404–05 (1974) (distinguishing between furlough, where statement of reasons not required under Civil Service Act, and personnel actions based on fault, where employee must be notified of reasons for adverse action). This principle does not apply to an employer's decision to furlough certain employees. Furlough is not a job action premised on any improper behavior of the individual furloughee but rather on general workplace circumstances resulting in the elimination of that furloughee's job. In the instant case, a broad reorganization of a cabinet level department in the executive branch resulted in the elimination of an entire functional group (BLGS) in the old department. Under these circumstances, the question of whether the furloughed jobs first succumbed to the lack of work resulting from the reallocation of duties or whether the reallocation of duties resulted in a loss of funding for the furloughed positions is an unenlightening conundrum akin to the chicken and the egg. Under the circumstances, the statement that the furloughed positions had not been funded provided Martin with sufficient and accurate notice as to the reason for his furlough. Moreover, in his appeal to the Commission, Martin stated that his furlough "was not due to lack of work or lack of funds." This assertion belies Martin's contention that he was not sufficiently on notice that employer would justify the furlough on both grounds.

## COMPLIANCE WITH DCED ACT

The DCED Act became effective on June 27, 1996, one day before Martin's furlough took effect, on June 28, 1996. Martin argues that as one of the personnel of DCA on the date DCED came into existence, he was a "subject of transfer" as defined in Section 103 of the DCED Act. Martin contends that as a subject of transfer he became a DCED employee as a matter of law pursuant to Section 305 [9] of the DCED Act and his furlough never took effect. There is no merit in this contention.

■ Section 103 defines "subjects of transfer", in pertinent part, as, "[P]ersonnel ... in connection with functions transferred from one entity to another under this act." 71 P.S. § 1709.103. The functions of DCA that were transferred under the DCED Act are very specifically listed under Section 301, 71 P.S. § 1709.301. This list does not include Martin's job among the functions specifically transferred under the DCED Act. The BLGS, where Martin worked, was completely eliminated. BLGS was supplanted by the newly created CLGS, a different entity charged with policy-making functions not previously a responsibility of employees at BLGS.[10]

9. Section 305 of the DCED Act provides, as follows:

(a) **General rule.**—The subjects of transfer from the Department of Community Affairs under this chapter are transferred to the Department Of Community and Economic Development, the Pennsylvania Historical and Museum Commission, the Pennsylvania Emergency Management Agency and the Department of Transportation, respectively, with the same force and effect as if those subjects of transfer had originally belonged to or had been incurred or entered into by those entities.

(b) **Employees.**—The transfers made under this chapter shall not affect the civil service status of affected employees of the Department of Community Affairs.

71 P.S. § 1709.305.

10. In his testimony before the Commission, Mr. Kim Coons, a member of the team that planned the dissolution of DCA and creation of DCED, described the functions of the CLGS, as follows:

The center provides a myriad of services to local governments. We are responsible for providing, coordinating and monitoring

Hence, the jobs performed at BLGS were not among those "functions transferred from one entity to another." Therefore, Martin was not among the personnel who were subjects of transfer defined in Section 103 and the automatic transfer directed under Section 305 is not applicable. Martin's furlough from his position at BLGS, a completely eliminated Bureau within the former DCA, was not affected by the enactment of the DCED Act.

Martin also asserts that, as an employee of the DCA, he was entitled to receive preference in employment in the newly formed CLGS, as directed in Section 301(f) of the DCED Act, 71 P.S. § 1709.301(f). Employment in DCED, the new agency, is not a cognizable issue in the context of an appeal to the Commission contesting the grounds for furlough from DCA. See Section 951(a) of the Civil Service Act, 71 P.S. § 741.951(a) (authorizing appeal of permanent separation, suspension for cause, furlough or demotion). In addition, we note that in any event Martin failed to preserve the issue for our review by his failure to raise it before the Commission. Pa. R.A.P. 1551.

## SUBSTANTIAL EVIDENCE JUSTIFYING FURLOUGH

"When there has been called into question the validity of a furlough, the appointing authority has the burden of going forward with proof to establish a prima facie case justifying the furlough, viz. that the furlough resulted from a lack of funds or a lack of work." *Department of State v.*

*Stecher,* 506 Pa. 203, 207, 484 A.2d 755, 757 (1984). In support of the furlough action, employer presented testimony from Karen Deklinski, the Deputy Secretary for Administration during the time of the departmental reorganization, and Richard Zerbe, the Chief of Budget and Fiscal Management and the Acting Director of Management Services. Deklinski and Zerbe participated in the reorganization process. Deklinski testified that in preparation for implementing the Governor's plan to restructure the DCA, she and the Secretary of DCA engaged in several months of research. This involved meetings with employees, program directors, representatives of non-profit associations and persons from the Governor's budget staff to determine where operational efficiencies could be enhanced and where a decrease in personnel would be warranted. Deklinski testified: "Our goal was to achieve the most efficient level of complement we could achieve and still provide programs to the constituents. Our goal was to make the programs that we did provide cost-effective and cost-efficient." Based on the result of the investigation and research, Zerbe prepared a budget for funding DCA in 1996–1997 at a reduced level in contemplation of the transfer of some functions to other agencies and the elimination of the BLGS. The Commission, having credited this testimony and noting that Martin had presented no substantial evidence rebutting employer's assertion that BLGS was eliminated in a good faith reorganizational streamlining, concluded that employer had produced sufficient evidence to justify

---

municipal training. We do consulting work. We provide technical assistance.

Specifically beyond that, we have a responsibility for policy development. The center is involved in analyzing and developing policy as it relates to local governments ... and we are often called upon to offer our analysis and the impact that policy initiatives would have on local governments. R. at 90a. See also Section 301(c) of the DCED Act, quoted in part *supra* at n. 3. With respect to the BLGS, Mr. Coons testified:

The Bureau historically had provided technical assistance. They did consulting

work. There was a Municipal Training Division.

Again, they provided a lot of specific – they worked with local governments on a number of specific tasks. . . .

We came to realize that it was important for our local governments to be more proactive in our approach in attempting to meet their needs. We also saw a great advantage in privatizing a number of the services that were provided by the Bureau. . . .

R. at 91a – 92a.

Martin's furlough on the basis of lack of work.

Martin cites *Stecher* for the proposition that the mere abolition of a position is not sufficient, in itself, to automatically establish a lack of work. *Stecher*, 506 Pa. 203, 210, 484 A.2d at 758–59. Martin contends that the work he performed at BLGS was simply shifted over to the CLGS, thereby, abolishing his position but not creating a lack of work. Martin misperceives the holding in *Stecher*, where our Supreme Court held that a lack of work could be established by evidence of a good faith reorganizational streamlining that results in the elimination of positions. The Court stated:

> In the present case there was presented unrefuted testimony that appellees' positions were eliminated, that a reorganizational streamlining did in fact occur, and that management in good faith believed that the work of the Bureau could more efficiently be conducted in the absence of the positions which were eliminated. We believe the appointing authority has, by this showing, met its burden of demonstrating that the furloughs were proper.
>
> . . . .
>
> The mere fact that duties assigned to appellees were reassigned to other personnel in the Bureau is not indicative that there was created by the reassignment an overload of work for the remaining employees to perform. Nor does it indicate that there had been sufficient work for the furloughed employees to perform, or that, in an efficiently organized workplace, the employees would have tasks to complete.
>
> . . . .

11. Section 905.1 of the Civil Service Act states as follows:
    No officer or employe of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or reli-

It is a managerial prerogative to reallocate work to enhance operational efficiency and to effect cost savings.

*Id.* at 210–11, 484 A.2d at 759. Based on the holding in *Stecher*, we conclude that employer established by substantial evidence that Martin was properly furloughed for lack of work.

DISCRIMINATION

Before the Commission, Martin contended that the furlough of BLGS employees, even if neutral on its face, had a discriminatory impact based on the furloughees' civil service status, union affiliation and age, in violation of Section 905.1 of the Civil Service Act.[11] "A civil service employee claiming discrimination in a personnel action has the burden of going forward with evidence to support such charges." *Sebastiani v. Department of Transp.*, 75 Pa.Cmwlth. 602, 462 A.2d 942, 944 (1983). The employee must produce sufficient evidence that, if believed and otherwise unexplained, indicates that more than likely discrimination has occurred. *Balas II*, 616 A.2d at 148. In support of his contention, Martin submitted statistical data and graphs comparing the workforce of the old DCA with that of the newly formed DCED. According to Martin's figures, the workforce at DCED was comprised of 24% fewer union employees and 39% fewer civil service employees than was the case at the former DCA. With respect to his averment of age discrimination, Martin testified that of forty civil service employees furloughed, thirty-five were over the age of forty. Martin further testified that he was not hired by DCED to fill a job for which he was qualified and that of forty persons hired by DCED all were less than forty years of age.[12] The

gious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors. 71 P.S. § 741.905a.

12. We note that this evidence pertains to a hiring decision, which is not relevant to the present action contesting a furlough.

Commission concluded that Martin had failed to present sufficient evidence of discriminatory intent.

Without commenting here as to the necessity for proof of discriminatory intent, *see, e.g., Balas II,* 616 A.2d at 149, we note that Martin's evidence does not establish that the furloughs from DCA resulted in a discriminatory impact. The data Martin produced draws a comparison between two completely different agencies, the former DCA and the current DCED. This in and of itself is of little, if any, probative value. For instance, Martin's data does not show which of those DCA employees were furloughed and which were transferred to other agencies, how many went to DCED, nor the composition of the Commerce department before transfers were made and it became DCED.[13] Martin's evidence is simply not susceptible to the inference he urges upon the court. Martin failed to produce evidence sufficient to sustain his burden and, therefore, the Commission properly rejected his allegations of discrimination.

Based upon the foregoing opinion, the Commission's order dismissing Martin's appeal is affirmed.

### ORDER

AND NOW, this 31st day of August, 1999, the order of State Civil Service Commission in the above captioned matter is hereby affirmed.

**13.** In addition, we note that although 242 persons worked at DCA when its elimination was first proposed in 1995, Martin's statistics regarding DCA relate to a period in 1996 after its numbers had already been reduced to 180. We know nothing of the composition of that first 25% of employees leaving between 1995 and 1996, nor under what circumstances they left.