# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Timothy D. Carney, :
:
            Petitioner :
:
            v. : No. 1177 C.D. 2013
: Argued:  April 22, 2014
Pennsylvania State System of :
Higher Education, :
:
            Respondent :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE MARY HANNAH LEAVITT, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**               **FILED:  August 14, 2014**

Timothy D. Carney (Petitioner) petitions for review of an order of the Chancellor of the Pennsylvania State System of Higher Education (PASSHE) that affirmed the decision of Slippery Rock University (Slippery Rock) to furlough Petitioner and abolish his position as Director of Maintenance Services at Slippery Rock.  For the reasons that follow, we affirm the Chancellor's order.

The facts as found by the Chancellor are as follows.  Petitioner was first hired by Slippery Rock in 1985 as a Project Manager (Draftsman-Designer). (June 12, 2013 Adjudication, Finding of Fact (F.F.) F.F. ¶1.)  Petitioner was promoted through various positions until his final promotion, in 2002, to the position of Director of Maintenance Services, which he held until his furlough in 2011.  (*Id.*, F.F. ¶¶2-6, 8, 10.)

In 2006, the Facilities and Planning Division in which Petitioner worked was reorganized, and Petitioner began reporting to the newly created position of Director of Facility Services, which was filled by Scott Albert in 2007. (*Id.*, F.F. ¶¶11, 12, 15.) Albert reported to Charles Curry, the Vice President for Finance and Administrative Affairs, who was one of four vice presidents at the university; Curry in turn reported to the President of Slippery Rock, Robert Smith. (*Id.*, F.F. ¶¶33, 34, 36.)

Prior to joining Slippery Rock, Albert had held a similar position overseeing maintenance operations at a university in Indiana, which used a zone maintenance system distinct from the shop structure employed by Slippery Rock. (*Id.*, F.F. ¶¶28-30.) Under the shop structure, the tradesmen were organized into seven trades, such as plumbing and electrical, and supervised by seven skilled foremen who reported to Petitioner. (*Id.*, F.F. ¶¶33, 69.) Under zone maintenance, rather than being divided up by trade, mixed groups of tradesmen were assigned to geographic areas of the campus. (*Id.*, F.F. ¶29.) Albert and President Smith discussed zone maintenance during Albert's employment interview in 2007, and President Smith was intrigued by the potential benefits of a transition to that system; the decision was made to delay a switch to zone maintenance at that time due to concerns of the tradesmen, so long as improvements were made in the Facilities and Planning Division. (*Id.*, F.F. ¶¶30, 31.)

Beginning in 2009, Slippery Rock began focusing on cost savings initiatives and budget cuts because of projected lower funding from the Commonwealth. (*Id.*, F.F. ¶40.) In November 2009, Vice President Curry asked Albert to provide suggestions for cost savings, and Albert responded by email with eight possible reforms, which included changes to the shift schedules, a zone

2

maintenance pilot project and to "[e]xamine moving [Petitioner] out of his current position to a staff function i.e., project management." (*Id*., F.F. ¶42; *see also* Nov. 5, 2009 Email, Reproduced Record (R.R.) at 551a-552a.)

As the fiscal year running from July 1, 2010 to June 30, 2011 (Fiscal Year 2010-11) approached, Slippery Rock faced an unprecedented $8.9 million projected budget shortfall, which was largely the result of anticipated cuts in appropriations from the Commonwealth and uncertainty as to whether Slippery Rock would receive federal stimulus funds. (Adjudication, F.F. ¶¶37, 43-45, 49.) As Slippery Rock could not raise its tuition and fees unilaterally, President Smith asked the Slippery Rock community as a whole for suggestions to close the shortfall but proclaimed that the university's primary goal was to preserve its academic programs. (*Id*., F.F. ¶¶46-49.) President Smith asked Albert directly to make recommendations for budget cuts in the Facilities Department for Fiscal Year 2010-11, and several of Albert's proposals were adopted and incorporated into the budget. (*Id*., F.F. ¶¶52, 53, 55.) Included among these were operational changes and personnel moves such as the removal of an unfilled painter position and filling the positions of grounds workers, an HVAC mechanic and the central storage foreman with lower classification positions. (*Id*., F.F. ¶55.) In the end, Slippery Rock was able to make up the $8.9 million shortfall and balance its Fiscal Year 2010-11 budget through various revenue enhancements and cost containments, including the elimination and freezing of numerous positions. (*Id*., F.F. ¶56.)

In July 2010, around the same period when President Smith requested cost savings recommendations from Albert for Fiscal Year 2010-11, President Smith also asked Albert to implement the switch to zone maintenance. (*Id*., F.F. ¶51.) The transition to zone maintenance was completed by February 2011. (*Id*.,

3

F.F. ¶64.) Petitioner played a key role in the transition from the shop structure to zone maintenance, including in the hiring process of new foremen responsible for the geographic zones and the creation of the zones. (*Id*., F.F. ¶¶66, 68.)

By switching to zone maintenance, the organizational structure of the Maintenance Services Department changed from seven shop foremen supervising tradesmen in a specific trade to three foremen supervising mixed trades in geographic campus zones along with a foreman supervising a project team. (*Id*., F.F. ¶¶69, 71, 76.) Thus, the number of foremen reporting to Petitioner was reduced from seven to four.[1] (*Id*., F.F. ¶72.) The anticipated benefits of switching to zone maintenance included: (i) improved communication with non-maintenance staff, as they would be dealing with less foremen; (ii) reduced travel time for tradesmen; (iii) reduced costs in needing fewer supervisors; and (iv) reduced overtime costs because preventive maintenance could be performed during the day. (*Id*., F.F. ¶¶65, 73, 77, 78.)

In March 2011, just after the switch to zone maintenance, Governor Thomas Corbett announced significant cuts to PASSHE appropriations in his proposed Commonwealth budget; as originally proposed, these cuts would have amounted to a $22 million, or 50%, reduction in the revenue Slippery Rock derived from the state. (*Id*., F.F. ¶57.) In the end, the budget projection for the fiscal year running from July 1, 2011 to June 30, 2012 (Fiscal Year 2011-12) called for an $8 million shortfall. (*Id*., F.F. ¶59.)

---

[1] An additional employee, an air monitoring equipment specialist who was in a non-supervisory role, also reported to Petitioner; this employee continued to report to Petitioner after the transition to zone maintenance. (Organizational Chart (Nov. 12, 2009), R.R. at 470a; Organizational Chart (June 28, 2011), R.R. at 500a.)

In response to the projected budget shortfall for Fiscal Year 2011-12, President Smith demanded cuts from all areas except the university's academic core. (*Id.*, F.F. ¶¶62, 63.) During a weekly meeting between Vice President Curry and Albert in April or May 2011, Albert proposed several options for reducing costs and one of those options was the elimination of Petitioner's position and to allow the four foremen to report directly to Albert. (*Id.*, F.F. ¶¶80, 81.) On June 15, 2011, Vice President Curry sent President Smith a memorandum recommending that Petitioner be furloughed and the position as Director of Maintenance Services be eliminated. (*Id.*, F.F. ¶83.) Curry explained the reason for his recommendation in the memorandum:

> Since the implementation of the Zone maintenance in our Facilities and Planning operation, whereby we have decentralized the staffing and trades related services of our campus with the oversight of four Building Maintenance Foremen, we no longer have a need for a management position directly over the trades area.

(*Id.*; *see also* June 15, 2011 Memorandum, R.R. at 590a.)

Petitioner was informed of the termination at a meeting with Vice President Curry and Lynne Motyl, the Assistant Vice President for Human Resources, on June 20, 2011. (Adjudication, F.F. ¶¶85, 86.) At the meeting, it was emphasized that the furlough did not relate to job performance, but rather was a result of budgetary difficulties and the streamlining of the Maintenance Services Department. (*Id.*) Motyl drafted a letter to Petitioner officially informing Petitioner of his furlough and this letter was sent on June 21, 2011 with President Smith's signature. (*Id.*, F.F. ¶¶84, 87.) Petitioner was given six weeks' notice and elected voluntary retirement on July 30, 2011 in order to receive continued health coverage and a portion of his unused sick leave. (*Id.*, F.F. ¶¶89-91.) Slippery

5

Rock was able to eliminate the $8 million shortfall in the Fiscal Year 2011-12 budget based in part on $2.4 million in cuts to salaries and wages, which included the elimination of Petitioner's position. (*Id*., F.F. ¶88.)

Petitioner challenged his furlough pursuant to the Merit Principles Policy (Policy) adopted by the PASSHE Board of Governors.[2] The Policy sets forth the primary personnel policy, including general standards, employee discipline rules, notice requirements and hearing procedure, for employees in PASSHE institutions who do not fall within one of twelve categorical exceptions. (Policy § B, R.R. at 541a-542a.) The Policy defines a furlough as "the termination of an employee's employment for a specified period of time or permanently as part of a reduction in workforce effort." (Policy § F, R.R. at 543a.) While the Policy does not elaborate on what criteria is necessary for a furlough of a PASSHE employee, courts have looked to the Civil Service Act[3] and related regulations and case law to require that a furlough be based upon either (i) a lack of funds or (ii) a lack of work. *See Bumba v. Pennsylvania State System of Higher Education*, 734 A.2d 36, 38 (Pa. Cmwlth. 1999); *see also* Section 3 of the Civil Service Act, 71 P.S. § 741.3(s) (defining furlough in Civil Service Act as "the termination of employment because of lack of funds or of work"). The Policy provides that the employer bears the burden of proof and the burden of going forward to make a prima facie showing that there was a lack of funds or lack of work. (Policy § L.3, R.R. at 547a); *Bumba*, 734 A.2d at 38-39; *see also Dougherty v. Department of*

---

[2] Policy 1983-01-A, adopted May 23, 1983, amended July 15, 1997 and October 9, 1997, R.R. at 541a-549a. The Policy was adopted by the PASSHE Board of Governors pursuant to Section 2006-A of the Public School Code of 1949. Act of March 10, 1949, P.L. 30, added by the Act of November 12, 1982, P.L. 660, *as amended*, 24 P.S. § 20-2006-A(a)(8).

[3] Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. §§ 741.1–741.1005.

*Health*, 538 A.2d 91, 93 (Pa. Cmwlth. 1988) (stating that burden of proof is on employer to establish lack of funds or lack of work in civil service appeal). Once the employer establishes a prima facie case, the employee may assert a defense or present relevant evidence rebutting the employer's case-in-chief. (Policy § L.4, R.R. at 547a.)

A hearing officer was designated by the PASSHE Chancellor to conduct Petitioner's merit principles appeal, and a hearing was held on August 20 and 21, 2012, at which Vice President Curry, Albert, Motyl and Petitioner testified. The hearing officer issued a proposed adjudication and order on February 5, 2013 concluding that the furlough was valid under the Policy, and the Chancellor of PASSHE adopted the adjudication and order on June 13, 2013.

In the adjudication, the Chancellor concluded that Slippery Rock had demonstrated that the furlough of Petitioner was based upon both a lack of work for Petitioner and a lack of funds to sustain Petitioner's position. The Chancellor based the conclusion that there was a lack of work on "the transition to zone maintenance in March of 2011, which resulted in reorganizational streamlining and the ultimate realization that the need for a middle management position was no longer necessary," and determined that the lack of funds was a result of "substantial budgetary shortfalls" at Slippery Rock and "the need to further cut costs." (Adjudication, Discussion at 31; *see also id.*, Conclusions of Law ¶¶12, 13.) The Chancellor rejected Petitioner's contentions that the furlough was based on Albert's animosity towards Petitioner, that the notice of furlough to Petitioner was defective because it did not explain the reasons for the furlough, and that the transition to zone maintenance did not result in a reduction of Petitioner's workload. (*Id.*, Discussion at 29-33.)

7

On appeal to this Court,[4] Petitioner first argues that the findings of fact supporting the Chancellor's conclusions that his position as Director of Maintenance Services was eliminated based upon a lack of work and a lack of funds are not supported by substantial evidence.[5] In arguing that the furlough could not have been caused by a lack of work, Petitioner contends that he was an essential part of the transition to zone maintenance and busier than ever following the transition and up until his furlough. Petitioner argues that zone maintenance did not result in the promised efficiencies, such as a reduction in travel time by tradesmen and that, despite the reduction in number of foremen, his overall supervisory responsibility was not reduced because he supervised the same total number of employees before and after the transition. Petitioner also argues that the budgetary pressures were overstated and there was therefore no lack of funds justifying his furlough. Petitioner points to various factors in support of this argument including that Slippery Rock faced a bigger deficit of $8.9 million the year before and did not have to lay off maintenance staff; raises were given in the Facilities and Planning Division in 2011; there was a surplus of approximately $300,000 for Fiscal Year 2011-12 which could have covered Petitioner's salary;

---

[4] This Court's scope of review is limited to determining whether there has been a violation of constitutional rights, whether errors of law have been committed, and whether necessary findings of fact are supported by substantial evidence. *Fisler v. State System of Higher Education, California University of Pennsylvania*, 78 A.3d 30, 39 n.9 (Pa. Cmwlth. 2013).

[5] Substantial evidence is such relevant evidence that a reasonable mind may consider as adequate to support a conclusion. *Kerr v. Pennsylvania State Board of Dentistry*, 960 A.2d 427, 436 (Pa. 2008). In determining whether the findings of an administrative tribunal are supported by substantial evidence, this Court reviews the entire record in the light most favorable to the prevailing party, giving that party the benefit of all reasonable inferences drawn from the evidence. *Fisler*, 78 A.3d at 42 n.15; *Joyce Outdoor Advertising, LLC v. Department of Transportation*, 49 A.3d 518, 523 n.2 (Pa. Cmwlth. 2012).

and new hires were made that year in the Facilities and Planning Division and a temporary position in that division was not eliminated.

A furlough based on a lack of work is proper when "the amount of work the employee is performing does not warrant his retention in view of the fact that the employee's work can more efficiently, from a cost or operational standpoint, be performed through reassignment to others." *Department of State v. Stecher*, 484 A.2d 755, 758 (Pa. 1984). To make a showing that a furlough was proper based upon lack of work, the employer must show that (i) a position was eliminated, (ii) a reorganizational streamlining occurred, and (iii) management believed in good faith that the work of the employer could be conducted more efficiently in the absence of the position eliminated. *Id*. at 759; *Haskins v. Department of Environmental Resources*, 636 A.2d 1228, 1229 (Pa. Cmwlth. 1994). The lack of work must precede the elimination of the position. *Dougherty*, 538 A.2d at 93; *Silverman v. Department of Education*, 454 A.2d 185, 190 (Pa. Cmwlth. 1982).

In order for a furlough to be based upon a lack of funds, there must be insufficient revenue to meet all financial demands unless modifications are made in the system. *Bumba*, 734 A.2d at 38; *County of Beaver v. Funk,* 492 A.2d 118, 121 n.6 (Pa. Cmwlth. 1985); *Forbes v. Department of Transportation,* 434 A.2d 892, 894 n.4 (Pa. Cmwlth. 1981). If a plan under which the employee was terminated does not reflect any substantial savings, this indicates that the employee was not terminated for lack of funds. *Bumba*, 734 A.2d at 39; *Department of Education v. Conmy,* 495 A.2d 976, 979 (Pa. Cmwlth. 1985).

Upon a full review of the record, we hold that there was substantial evidence before the Chancellor to support the conclusions that Petitioner was

9

terminated for a lack of work and lack of funds. Regarding the issue of whether there was a lack of work, the evidence demonstrates that prior to the transition to zone maintenance, Petitioner supervised seven foremen in charge of separate trades while after the restructuring the Maintenance Services Department was streamlined by reducing the number of foremen to four, each of whom supervised a mixed group of tradesmen. (Organizational Chart (Nov. 12, 2009), R.R. at 470a; Organizational Chart (June 28, 2011), R.R. at 500a.) Thus, as a result of the restructuring Petitioner had three less foremen to supervise and Petitioner's responsibility of supervising multiple trades had been committed to the zone foremen. (*See* June 15, 2011 Memorandum, R.R. at 590a.) Vice President Curry, Albert and Motyl each testified that it was understood that with the transition to zone maintenance, Slippery Rock could achieve greater cost efficiencies by eliminating the middle layer of Petitioner's position. (Hearing Transcript (H.T.) at 42-43, 115, 235, R.R. at 47a-48a, 120a, 240a.) This good faith belief by Slippery Rock management that the Maintenance Services Department could effectively and efficiently be run with Albert directly supervising the zone tradesmen is sufficient for a finding of a furlough based on lack of work. *Stecher*, 484 A.2d at 759. "[W]hen an agency determines that necessary work can be performed adequately with fewer employees, thus saving Commonwealth funds, that agency is obliged to 'tighten up' its work force by eliminating excess positions." *Haskins*, 636 A.2d at 1229; *see also Stecher*, 484 A.2d at 759.

Petitioner contends that the conclusion that his "middle layer management position was no longer necessary," (Adjudication, Discussion at 33), was undermined by the fact that two other middle managers under Albert were retained and that he was the only individual out of 150 employees in the Facilities

10

and Planning Division who was furloughed in 2010 or 2011. Petitioner further argues that, contrary to the statement in President Smith's termination letter, Slippery Rock performed no systematic review of work activities in the Facilities and Planning Division. However, whether Slippery Rock could or should have cut other positions instead of Petitioner's is not an issue before us; management, rather than the courts, is entrusted with the discretion to determine what actions will best promote the efficiency of the agency's service to the public. *Stecher*, 484 A.2d at 758; *Stover v. Department of Environmental Resources*, 636 A.2d 1275, 1277 (Pa. Cmwlth. 1994); *Vovakes v. Department of Transportation*, 453 A.2d 1072, 1074 (Pa. Cmwlth. 1982). Here, management at Slippery Rock presented sufficient evidence to demonstrate that the elimination of Petitioner's position was motivated by the reorganizational streamlining that shifted his responsibilities to other employees.

The Chancellor's conclusion that there was a lack of funds is also supported by substantial evidence. Slippery Rock put forth ample testimony and evidence demonstrating that there was insufficient projected revenue for both Fiscal Year 2010-11 and Fiscal Year 2011-12 and that significant cuts were necessary to meet the financial demand of balancing those budgets. In order to eliminate projected budget shortfall for Fiscal Year 2010-11, Slippery Rock made $1.45 million in personnel cuts in part by eliminating over 42 positions, with at least 11 of those positions being active. (Fiscal Year 2010-11 Working Budget Reconciliation, R.R. at 558a.) Facing a shortfall of $8 million in Fiscal Year 2011-12, Slippery Rock eliminated $2.4 million in payroll, which included the elimination or reduction in hours of 24 positions. (Fiscal Year 2011-12 Budget, R.R. at 588a; Fiscal Year 2011-12 Eliminated or Reduced Positions, R.R. at 649a.)

11

In addition to Petitioner, two other managers were furloughed and one was reduced to part-time status in Slippery Rock's Life Long Learning Program, employees in the Pennsylvania Center for Environmental Excellence were furloughed, and two vacancies in the Facilities and Planning Division were eliminated, including a maintenance repairman position. (H.T. at 36, 66-68, 78, 111, 137, 187-88, R.R. at 41a, 71a-73a, 83a, 116a, 142a, 192a-193a; Fiscal Year 2011-12 Eliminated or Reduced Positions, R.R. at 649a.) Beyond eliminating positions, Slippery Rock also put into effect numerous other cost saving measures in order to eliminate the $8 million budgetary shortfall for Fiscal Year 2011-12, including reducing utility and technology expenses. (Fiscal Year 2011-12 Budget, R.R. at 588a.)

That Slippery Rock achieved a budgetary surplus for Fiscal Year 2011-12 or could have found a way to preserve Petitioner's position is irrelevant to this analysis. As we have previously explained, a lack of funds does not require bankruptcy, but rather insufficient revenue to satisfy "*all* financial demands unless modifications are made." *Forbes,* 434 A.2d at 894 n.4 (emphasis added); *see also Funk,* 492 A.2d at 121 n.6. Here, there is abundant evidence that Slippery Rock faced severe financial pressures in Fiscal Year 2010-11 and Fiscal Year 2011-12 and was required to make deep cuts in personnel and other areas to balance its books. It would be inappropriate for a court to analyze each line item on an agency's budget in isolation or opine on what cuts the agency should have prioritized, particularly here where Slippery Rock faced continual financial pressures from 2009 until the time of Petitioner's furlough, with the expectation that such pressures would continue into the future. (*See* H.T. at 97, 115, R.R. at 102a, 120a-121a.) Nor should we dismiss the financial exigencies that required the furlough based upon the fact that a budgetary surplus was achieved in a large

12

institution such as Slippery Rock which must adhere to a fluid, continually changing budgetary process subject to various factors that are largely outside of its control such as Commonwealth appropriations and enrollment levels. (*See* H.T. at 71-73, R.R. at 76a-78a.)

Petitioner argues that the lack of funds justification for the furlough was undermined by the fact that zone maintenance was not implemented with the intention of cutting costs and it did not in fact save money. That the transition to zone maintenance was primarily motivated by non-financial reasons and there were short-term costs[6] associated with it, however, does not negate that Slippery Rock was facing a severe financial crisis that justified Petitioner's furlough. Moreover, management also saw the transition to zone maintenance as a way to cut costs by reducing the amount of overtime hours worked, (H.T. at 120, R.R. at 125a), and by eliminating three foremen positions. (H.T. at 48, 193, R.R. at 53a, 199a.) Shortly after the transition was completed, management recognized that it could further streamline the Maintenance Services Department, improve communication within that department and save additional personnel costs by

---

[6] In addition to the short-term costs for the purchase of tools, which is undisputed, Petitioner also argues that the transition to zone maintenance added approximately $50,000 in annual salary to the Maintenance Services Department payroll. (*See* Salary Comparison Chart, R.R. at 504a.) While it is unclear on the record before us what the exact payroll savings were following the transition to zone maintenance, Petitioner's asserted increase of $50,000 is misleading as it includes salaries of employees who filled vacant, already budgeted positions and standard salary increases under the tradesmen's collective bargaining agreement, and does not account for the fact that there were four fewer employees in Maintenance Services after the transition, in addition to himself. Slippery Rock asserted that the furlough of Petitioner and elimination of three foremen reduced the payroll by $328,000, (*see* Adjudication, F.F. ¶77; Facilities and Planning Cost Savings Chart, R.R. at 616a); however this number only contemplated the cost savings in salary and benefits in management payroll and did not account for the demotion of two shop foremen to rank-and-file tradesmen at continued management-level wages.

13

eliminating Petitioner's position. (H.T. at 42-43, 50, 108, 115, 121, 235, 245, R.R. at 47a-48a, 55a, 113a, 125a, 240a, 250a.) Based on the evidence presented it is clear that both the reorganizational streamlining and budgetary crisis contributed to the decision to furlough Petitioner.[7]

Petitioner further argues that the asserted justification of a lack of funds was undermined by the fact that the two contemporaneous documents relating to the furlough – the memorandum from Vice President Curry to President Smith recommending Petitioner's furlough and President Smith's letter officially informing Petitioner of the furlough – did not cite the lack of funds but rather stated only that the furlough was a result of the reorganization of the Facilities and Planning Division. A furlough, unlike other actions such as a termination for cause, is not predicated upon specific acts by the employee but rather external economic pressures and workplace reorganizations that are not easily distilled; for this reason, neither the Policy nor the Civil Service Act require that the notice of furlough include discussion of the justifications which the employer would later use if the furlough is challenged. *Martin v. State Civil Service Commission (Department of Community and Economic Development)*, 741 A.2d 226, 230-31

---

[7] We recognize that this case represents the rare situation where a furlough is justified both by a lack of funds and lack of work, as a result of the fact that the effort to balance the Fiscal Year 2011-12 budget and the reorganization to the zone maintenance system occurred in the same period. The two rationales of lack of work and lack of funds, however, are not exclusive, and it is unnecessary here to determine to what degree the reorganizational streamlining or budgetary crisis predominated in the decision to furlough as it was justified under both rationales. *See Stecher*, 484 A.2d at 759 (noting that a furlough based on a reorganizational streamlining can be done both to "enhance operational efficiency and to effect cost savings"); *Martin v. State Civil Service Commission (Department of Community and Economic Development)*, 741 A.2d 226, 231 (Pa. Cmwlth. 1999) (noting that in certain circumstances the determination of whether a furlough results from a lack of work or a lack of funds "is an unenlightening conundrum akin to the chicken and the egg").

(Pa. Cmwlth. 1999) (stating that a furlough is not an adverse employment determination requiring notice of the basis for the action); 4 Pa. Code § 105.3 (Civil Service Commission rule requiring only notices of removal, involuntary demotion or suspension to specify reasons for action); (Policy § H, R.R. at 544a-545a (requiring only notices of involuntary demotion, suspension or termination to specify reasons for action).) Therefore, we decline here to read the absence of a discussion of Slippery Rock's budgetary issues in the contemporary communications regarding Petitioner's furlough as precluding Slippery Rock from raising those issues in the merit principles appeal.

Petitioner next argues that, rather than showing a lack of work or lack of funds, Slippery Rock's asserted justifications for the furlough were a pretext and the real reason for the termination was Albert's personal animus towards Petitioner. Petitioner cites various items of evidence adduced at the hearing which he asserts support his theory that the furlough was made in bad faith, including: (i) the failure by management to engage in any research, conduct an analysis or interview the foremen regarding the furlough of Petitioner; (ii) Petitioner's key role in the transition to zone maintenance and Albert's assurances to the tradesmen that Petitioner would continue in his role after the transition; (iii) Petitioner's satisfactory performance evaluations until Albert was hired and lowered evaluations under Albert; (iv) Albert raising the issue of whether to eliminate Petitioner's position in 2009 and 2010; (v) Vice President Curry's reliance on Albert's recommendation to eliminate Petitioner's position without performing an independent analysis; (vi) statements purportedly made by Albert that the two would never be friends; and (vii) the fact that Albert did not eliminate another

15

vacant middle-management position at the time of Petitioner's furlough and later filled that position.

The Chancellor addressed and rejected Petitioner's personal animus theory in the adjudication. First, the Chancellor noted that Albert did not initiate the recommendation to eliminate Petitioner's position but rather the recommendations were made in response to requests for cost-savings initiatives by Vice President Curry and President Smith. Next, the Chancellor found not credible Petitioner's testimony that Albert had said the two would never be friends and stated that, even if true, Albert was Petitioner's supervisor and friendship between the two was unnecessary for an effective working environment. Finally, the Chancellor concluded that, as Petitioner's supervisor, Albert was intimately familiar with the operations of the Facilities and Planning Division and therefore there was no need for Albert to review Petitioner's job responsibilities or discuss the furlough with the foremen beforehand.

As the fact-finder here, the Chancellor was responsible for resolving evidentiary conflicts and making credibility determinations, and he was free to accept or reject testimony even where uncontradicted. *Fisler v. State System of Higher Education, California University of Pennsylvania*, 78 A.3d 30, 44 (Pa. Cmwlth. 2013); *Allied Mechanical and Electrical, Inc. v. Pennsylvania Prevailing Wage Appeals Board*, 923 A.2d 1220, 1228 (Pa. Cmwlth. 2007). Here, the Chancellor evaluated the evidence regarding Petitioner's proffered alternate theory for his furlough and determined that this evidence was insufficient to rebut Slippery Rock's prima facie showing that the furlough was based upon a lack of work and lack of funds. On review, we may not reweigh the evidence or substitute our judgment for that of the Chancellor, even if we would have reached a different

16

conclusion. *Perry v. State Civil Service Commission (Department of Labor and Industry)*, 38 A.3d 942, 948 (Pa. Cmwlth. 2011).

Petitioner's final argument is that he was denied due process because he was not afforded his right to defend himself "before a fair and impartial tribunal." *Lawson v. Department of Public Welfare*, 744 A.2d 804, 806 (Pa. Cmwlth. 2000). As evidence of this purported impartiality, Petitioner argues that the hearing officer: (i) failed to cite any of Petitioner's testimony or give any indication that his testimony was not credible, (ii) cited fifteen of the exhibits produced by Slippery Rock for the hearing while only citing one of Petitioner's exhibits, and (iii) failed to use any of Petitioner's proposed findings of fact, while relying heavily on Slippery Rock's proposed findings.

We see nothing in the adjudication or otherwise in the record that would demonstrate that Petitioner's due process rights were infringed. Initially, we note the Chancellor was the ultimate fact-finder in this case, not the hearing officer. *Fisler*, 78 A.3d at 42; (Policy § L.1, R.R. at 547a ("The chancellor or his designee shall conduct hearings for university employees and...[t]he chancellor...[is] hereby authorized to retain hearing officers to conduct hearings and issue recommendatory adjudications.").) Therefore, the Chancellor was not bound by the recommendation of the hearing officer, *Fisler*, 78 A.3d at 42, and both parties were afforded the opportunity to, and did, submit briefs to the Chancellor to advocate on the merits of the hearing officer's proposed adjudication prior to the issuance of the final adjudication.

Petitioner's argument is essentially that the Chancellor did not believe his version of the events leading up to his furlough. Disagreeing with one party's evidence or characterization of the evidence, however, does not constitute a denial

17

of due process. The fact-finder is free to accept or reject testimony or evidence, even where uncontradicted, and is not required to explain why he rejected such testimony or evidence. *Fisler*, 78 A.3d at 44; *Allied Mechanical and Electrical,* 923 A.2d at 1228. Nor is the fact-finder required to make explicit credibility determinations to the extent such determinations are implicit in the decision. *Fisler*, 78 A.3d at 44; *Gwinn v. Pennsylvania State Police*, 668 A.2d 611, 615 (Pa. Cmwlth. 1995).

Here, rather than showing bias, the Chancellor relied more on the evidence submitted by Slippery Rock rather than Petitioner's evidence because Slippery Rock submitted the bulk of the evidence concerning the central issues of the case, the budgetary crises and reorganization of the Maintenance Services Department. Petitioner's testimony and evidence, on the other hand, primarily related to issues that were not directly related to the core issues before the Chancellor, Petitioner's work performance and Albert's supposed dislike of Petitioner. Furthermore, it was implicit in the adjudication that the Chancellor credited the testimony of Slippery Rock's witnesses and made a specific credibility determination regarding Petitioner, finding Petitioner's assertion that Albert told Petitioner that he did not like him to be not credible. (Adjudication and Order, Discussion at 31.) Finally, we discern no impropriety in the fact that the Chancellor adopted in large part the findings of fact proposed by Slippery Rock; the findings adopted by the Chancellor were supported by substantial evidence, and Petitioner, unlike Slippery Rock, did not draft his proposed findings in support of the conclusions reached by the Chancellor.[8]

---

[8] Petitioner also argues that the hearing officer was not impartial, and he was thus denied due process, because she works for the Office of General Counsel, which, Petitioner asserts, is the **(Footnote continued on next page…)**

Because the findings and conclusions in the adjudication are supported by substantial evidence, we affirm the order of the Chancellor.

_____
JAMES GARDNER COLINS, Senior Judge

_____
**(continued…)**
same entity that employs PASSHE's counsel. This putative conflict of interest was not raised before the agency below, and is therefore waived. *See* 2 Pa. C.S. § 703(a); Pa. R.A.P. 1551(a); *Chapman v. Unemployment Compensation Board of Review*, 20 A.3d 603, 611 (Pa. Cmwlth. 2011) (holding that a petitioner waives an appellate argument when the petition failed to raise the error before the agency below). Nevertheless, we find no support for Petitioner's assertion that the hearing officer and counsel for Slippery Rock were employed by the same entity; the hearing officer was employed by the Office of General Counsel, which is separate and distinct from PASSHE.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Timothy D. Carney,                                :
                                                  :
                     Petitioner                   :
                                                  :
          v.                                      : No. 1177 C.D. 2013
                                                  :
Pennsylvania State System of                      :
Higher Education,                                 :
                                                  :
                     Respondent                   :

# O R D E R

AND NOW, this 14th day of August, 2014, the order of the Chancellor of the Pennsylvania State System of Higher Education in the above-captioned matter is hereby AFFIRMED.

_____
JAMES GARDNER COLINS, Senior Judge